UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Andrew **Dankanich** and<br>Nicholas **Marrandino**, *Plaintiff(s)*;<br><br>                         *vs.*<br><br>Marcel **Pratt** and<br>City of **Philadelphia**, *Defendant(s)*. | *No.* 19-CV-735 (MSG) |

## PLAINTIFFS' AMENDED COMPLAINT

Plaintiffs Andrew J. Dankanich and Nicholas A. Marrandino through their attorney, bring this action against Defendants Marcel Pratt, in his official capacity as the City Solicitor of Philadelphia, as well as the City of Philadelphia, for violations of their rights to due process and free speech under the 1st and 14th Amendments of the United States Constitution, as well as the Civil Rights Act, 42 U.S.C. § 1983, and related state law claims.

## INTRODUCTION

Plaintiffs Dankanich and Marrandino in the course of their employment became aware of significant fraud being perpetrated by Conduent State & Local Services and the Philadelphia Parking Authority ("PPA") that was facilitated by the Executive Director, Vincent Fenerty, and others. The fraud implicated both $100 million in procurement fraud as well as contractual penalties that went unpaid. Plaintiffs attempted to rectify this fraud but were terminated for their investigation into- and interference with- the fraud. This fraud directly affects the monies being paid to the City of Philadelphia and School District of Philadelphia, and the amounts owed are known to exceed $3 million dollars, and were estimated internally at the PPA to be greater than $25 million.

Plaintiffs' presented this fraud as a proposed complaint to Defendant Pratt, as City Solicitor of Philadelphia, pursuant to the Philadelphia Code False Claims Ordinance ("FCO") § 19-3601 *et seq.* on October 17th, 2018. The complaint was cursorily denied in a **six-minute** phone call on November 2nd, with minimal investigation by the City Solicitor and without providing a justification. Thereafter, Plaintiffs have attempted to work with the City Solicitor's office to move their meritorious complaint forward so that the City can recover this money. However, the City Solicitor's office has repeatedly denied their complaint in an arbitrary and capricious manner, actively choosing to "Do Nothing" with the Plaintiffs' fraud allegations, culminating with a final pretextual denial due to the complaint lacking an element that is not required by the Ordinance.

Plaintiffs' allege that the reason their complaint has been so stridently denied by the City Solicitor has nothing to do with the merits of the case, but instead due to the need for political expediency to protect individuals both within and closely associated with Philadelphia leadership. Further, Plaintiffs allege that the actual purpose for the City Solictor's option to "Do Nothing" is to insulate those same individuals—the ones who historically are both most likely and able to commit fraud—from liability for their fraud against the City.

Plaintiffs bring this Complaint for declaratory and equitable relief, seeking to strike the unconstitutional provision of the City's False Claims Ordinance that permits the City Solicitor to Do Nothing with a relator's complaint, and further enjoining the City Solicitor by requiring him to designate Plaintiffs' to move forward with the proposed complaint.

## PARTIES

1. Plaintiff Andrew J. Dankanich is an adult individual, residing at 3104 S. 13th Street, Philadelphia, Pennsylvania, 19148, and was a named Plaintiff-Relator on the proposed complaint, *City of Philadelphia ex rel. Andrew Dankanich and Nicholas Marrandino v. Conduent State & Local Services, Philadelphia Parking Authority, Vincent Fenerty, and James Hoch*, presented to the City Solicitor on October 17th, 2018.

2. Plaintiff Nicholas A. Marrandino is an adult individual, residing at 2319 S. Percy Street, Philadelphia, Pennsylvania, 19148, was a named Plaintiff-Relator on the proposed complaint, *City of Philadelphia ex rel. Andrew Dankanich and Nicholas Marrandino v. Conduent State & Local Services, Philadelphia Parking Authority, Vincent Fenerty, and James Hoch*, presented to the City Solicitor on October 17th, 2018.

3. Defendant Marcel Pratt is named in his official capacity as City Solicitor of Philadelphia, who is the official designated by ordinance to be responsible for execution of the False Claims Ordinance, Philadelphia Code § 19-3601 *et seq.* Defendant Pratt as City Solicitor heads the Law Department which is the executive department responsible for assisting the City Solicitor in his duties ("City Solicitor's office"). References to the City Solicitor in this Complaint include those acting under his authority and on his behalf.

4. Defendant City of Philadelphia, is a Municipal Corporation of the First Class of the Commonwealth of Pennsylvania under the First Class City Home Rule Act of April 21st, 1949, P.L. 665, § 1 *et seq.*

## OTHER PERSONS & ENTITIES

5. Ms. Diana Cortes is Chair of the Litigation Department in the City Solicitor's office and has been the responsible point of contact for all of Plaintiffs' interactions with the City Solicitor. At all times, Ms. Cortes acted on the authority of Defendant Pratt and on behalf of the City of Philadelphia.

6. Ms. Eleanor Ewing is Chief of the Affirmative & Special Litigation Unit in the City Solicitor's office, the unit that is responsible for any False Claims complaints made on behalf of the City. Ms. Ewing is believed to be a direct-report to Ms. Diana Cortes in the administration of the City Solicitor's office.

7. Philadelphia Parking Authority ("Parking Authority") is the Parking Authority for the City of Philadelphia under Title 53 Pa. C.S.A. § 5501 *et seq.*, created by ordinance of the City on January 11th, 1950. Plaintiffs were previously employees of the Parking Authority and were aware of extensive fraud that the Parking Authority was party to that directly affected the funds received by the City and School District.

8. Conduent State and Local Services, Inc. ("Conduent") is a New York corporation previously known as "Xerox State and Local Solutions, Inc." Conduent has a contract with the Philadelphia Parking Authority that is primarily at issue in the Plaintiffs' underlying proposed complaint made to the City Solicitor, whereupon they were fraudulently awarded contracts for Red Light Cameras and failed to pay penalties owed under those contracts.

9. Mr. Joseph Ashdale is the current Chairman of the Board of Directors for the Philadelphia Parking Authority, having been a board member since the state takeover in 2001. Mr. Ashdale is also the Business Manager and Secretary/Treasurer for the International Union

of Painters and Allied Trades District Council 21 ("District Council 21"). Mr. Ashdale and his union are also well-known for their relationship with Mayor Kenney, including significant financial contributions.

10.   Mr. John "Johnny Doc" Dougherty is the Business Manager of the International Brotherhood of Electrical Workers Local 98 ("Local 98") Mr. Dougherty was recently indicted by the U.S. Attorney in Philadelphia on 116-counts of fraud and corruption, including conspiracy to defraud the City of Philadelphia. Mr. Dougherty's Union received contracts and benefits from the Conduent contract, as well as was able to place family members and political allies at positions within Conduent. Mr. Dougherty and his union are also well-known for their close alliance with Mayor Kenney which includes significant financial support.

11.   Mrs. Lisa Dougherty is the Project Manager for Conduent's Red Light program in Philadelphia, despite a lack of qualifications. Ms. Dougherty is Mr. John Dougherty's sister-in-law, and one of many patronage hires at Conduent made by Mr. Fenerty.

12.   Mr. Vincent J. Fenerty, Jr. was Executive Director of the Philadelphia Parking Authority until his resignation in September 2016, and was directly and inappropriately involved in ensuring both Conduent's award of the Parking Authority's Red Light Camera program as well as ensuring that Conduent did not pay the contractual penalties. Mr. Fenerty was the Executive Director of the PPA for more than a decade, placing him in control both a large organizational budget and the majority of patronage jobs within the City, which he used to curry favor and influence.

13. Mayor James Kenney is the current Mayor of the City of Philadelphia, who assumed office in 2015. Prior to election as Mayor, he was a Philadelphia Councilman-at-Large beginning in 1992. Mayor Kenney is a self-proclaimed "Union Mayor" with extensive ties to Philadelphia unions, including both Mr. Dougherty and Mr. Ashdale, as well as a long personal and professional relationship with Mr. Fenerty. Finally, the City Solicitor directly reports to the Mayor and may be removed at his pleasure.

## JURISDICTION AND VENUE

14. This Complaint arises under the U.S. Constitution, specifically the 1st and 14th Amendments, and from federal law, namely 42 U.S.C. § 1983, therefore this Court has jurisdiction under 28 U.S.C.§ 1331. The Court has jurisdiction under the related state law claims under 28 U.S.C.§ 1367.

15. Venue is proper under 28 U.S.C. § 1391 as the City of Philadelphia is contained within this Courts' judicial district, Defendant Marcel Pratt is being sued in his official capacity as City Solicitor of Philadelphia, and all relevant events related to this action occurred within this district.

# FACTS

*Philadelphia False Claims Ordinance*

16. The False Claims Ordinance ("FCO") was enacted by Philadelphia City Council in 2010 to "fight fraud [and] raise money for the City" through enhanced penalties but "**most importantly** [to] encourag[e] those with knowledge of fraud by protecting them [and] providing financial incentives." Transcript of 12/16/2009 Hearing for Cmte. on Law and Govt., Phila. City Council (Statement of Councilman William Greenlee, Chair and Bill Sponsor) at 3:9–11, *Id.* (Statement of Amy Kurland, Philadelphia Inspector General) (emphasis added) at 6:13-17.

17. The FCO is "whistleblower" law "based pretty much on the federal regulations", *Id.* (Statement of Councilman Greenlee) at 3:7–9, showing the City's intent for their law to be congruent with the 156-year history of the Federal False Claims Act.

18. Tracking its federal progenitor, the FCO provides that whistleblowers "shall be entitled" to share in the award proceeds to the City of Philadelphia, regardless of whether that share arises in civil action or alternative remedy.

19. It similarly provides for enhanced (trebled) damages and allows for either the City Solicitor or attorney for the whistleblower to pursue remedies on behalf of the City.

20. The False Claims Ordinance also retains the post-filing procedural rights of the government, where the City may settle or discontinue an action being conducted by the whistleblower's attorney despite their objection, after opportunity to be heard by a judge. FCO § 19-3603 (6) (b).

21. This opportunity to be heard by a judge is a key component of the procedural protections required to properly implement false claims legislation, as recognized by the Federal False Claims Act: only a judge is qualified to properly rule on the issues raised during this type of litigation, which is explicitly recognized both in the federal law and the City's implementation.

22. However, the FCO deviates procedurally from the related federal act: Instead of filing a complaint under seal with the Courts, the FCO required complaints to be submitted to the City Solicitor. *See generally,* FCO § 19-3603 (2), *compare* 31 U.S.C. §3730 (b).

23. The City Solicitor then acts on the complaint in accordance with the FCO, where he has four exclusive options: (1) adopt the complaint for the City and file a civil action, (2) designate the whistleblower's attorney to file a civil action on behalf of the City,[1] (3) neither adopt the complaint nor designate the whistleblower's attorney ("Do Nothing"), or finally (4) proceed in any other manner the City Solicitor deems appropriate.

24. The City Solicitor can then choose to Do Nothing with a whistleblower's complaint, which denies them their right in Court to a fair hearing before a judge on the disputed issues between the government and whistleblower.

25. Further, the City Solicitor choosing to Do Nothing also deprives Plaintiffs of their property rights in a share of the City's proceeds from the recovery of the fraud.

---

[1] Designation is the appropriate outcome if the City Solicitor is uncertain about a potential claim. It allows the whistleblower to bear the burden and expense of pursuing the claim against the tortfeasor, and it either does not consume city resources or use such minimal resources that it can be safely ignored.

26. No other implementation of the federal False Claims Act—over more than 30 states and at least 9 municipalities—empowers an official with absolute discretion to determine the validity or merit of a proposed false claims complaint.[2]

27. Finally, upon information and belief, the City Solicitor's office has never acted on a proposed complaint brought by a whistleblower under the FCO.[3]

*False Claims by Parking Authority and Conduent*

28. Plaintiff Andrew Dankanich was an employee of the Philadelphia Parking Authority as "Red Light Manager" from January 22nd, 2013 until his termination on March 1st, 2017. As Red Light Manager, Plaintiff Dankanich was ostensibly responsible for the Parking Authority's Red Light Camera program.

29. Plaintiff Nicholas Marrandino was an employee of the Parking Authority as "Quality Assurance Officer" from late 2014 until his termination on July 9th, 2017. Plaintiff Marrandino was not assigned to the Red Light Camera staff but instead worked for various directors of the Parking Authority; However, he spent the majority of his time in that position dealing with issues surrounding the Red Light Camera system.

30. During their tenure at the Parking Authority, Plaintiffs Dankanich and Marrandino became aware of significant problems with the Red Light Camera system: procurement irregularities prior to the award of the contract to Conduent; technical defects where the system once

---

[2]In fact, the FCO implemented by the City makes no allowance for the potential of self-interested or self-dealing City officials: if the City Solicitor or any political allies were implicated, they can—without regard for the merit of the complaint—'kill' it through the Do Nothing option without any remedy for potential relators.

[3]The City Solicitor has brought claims under the FCO on behalf of his office, the latest being an claim against prescription drug manufacturers related to the 'opiod crisis.' This case was brought largely for political capital for the City and City Solicitor's office as the damages theory proposed by this complaint is extremely tenuous.

installed did not meet the standards required by the contract; financial irregularities where required contractual penalties were not being paid due to a private agreement between Vincent Fenerty, and Conduent executives; and finally the allowance of Conduent to bid on a renewal contract that they were subsequently awarded—despite the fact that they did not and could not qualify as a responsible bidder.

31. Conduent, Mr. Fenerty, and others conspired to award Conduent the Red Light Camera system contract by the Parking Authority, despite their actual knowledge prior to the award that the systems were deficient and did not meet the Request for Proposal (RFP) made by the Parking Authority.[4]

32. The award of these contracts was estimated to be worth approximately $100 million dollars to Conduent ($25 million for the initial 2014 award, and $75 million for the 2017 renewal award.) As Conduent is now providing Speed Camera services through a non-competitive bid process using the Red Light cameras; the value of the renewal is likely understated.

33. Further, Conduent owes contractual penalties for technical defects (unrelated to the inability to perform to the standard of the RFP) due to excessive system/camera downtime. This was known to exceed $3 million at the beginning of 2017 by Plaintiffs', with Conduent conceding several times that they owed significant penalties.[5]

34. However, due to the conspiracy among Conduent, Mr. Fenerty, and others, Fenerty ordered the PPA to refund all penalties withheld from Conduent and further stop withholding any monies—despite the clear contractual language authorizing such penalties—so as to protect

---

[4]Mr. Fenerty and the Philadelphia Parking Authority went so far as to actively mislead the Commonwealth Court about this fraudulent contract award, when challenged by another bidder. *See American Traffic Solutions, Inc. v. Philadelphia Parking Authority*, 2014 WL 2447308 (Pa. Commw. Ct. 2014)

[5]The number used by Plaintiffs' based on their first-hand accounting; an internal Parking Authority audit requested by Vincent Fenerty and conducted by his Internal Audit Manager, George Fieo, CPA, valued the unpaid penalties at approximately $25 million.

Conduent from financial harm. These penalties owed to the PPA by Conduent total no less than $3 million dollars, and may exceed $25 million.

35. The monies owed to PPA by Conduent are not 'fines' as defined by 75 Pa C.S. § 3116 (k) (1), but instead are penalties that would go into the PPA's general fund.

36. Simultaneously to this ongoing fraud, the PPA—thorough its officers including Mr. Fenerty— **falsely represented** to the City of Philadelphia that it was unable to pay the full amounts due under 75 Pa. C.S. § 6109 (g) (2)-(3), and if it was required to do so would result in a budget shortfall to the School District of Philadelphia.[6]

37. As a result, the City received—on an annual basis—approximately $3 million dollars less than it was entitled to, since at least 2014. Therefore, this fraud perpetrated by Conduent, Mr. Fenerty, the PPA, and others directly harmed the City of Philadelphia's revenue.

38. The full breadth of the fraud and corruption are detailed in the attached amended complaint submitted to the City Solicitor *Ex. A*.

39. Plaintiffs attempted various means of bringing these issues to light after their termination, both working within the Parking Authority by speaking to Board Members as well as outside individuals, including City Councilman, the press, and even the Federal Bureau of Investigation. However, no action was taken.

40. After reading news reports of an unrelated federal False Claims settlement, Plaintiff Dankanich then retained counsel, and in cooperation with Plaintiff Marrandino and Counsel, the allegations were investigated, and a complaint was drafted under the Philadelphia False Claims Ordinance § 19-3602 (2).

---

[6]Alone, this false representation amounts to a *prima facie* violation of the FCO § 19-3602 (1)-(4) that would subject the Parking Authority to enhanced damages and penalties.

*An Unresponsive City Solicitor*

41. As the complaint was finalized, Plaintiffs' Counsel reached out to the City Solicitor's office to request guidance on how this complaint should properly be provided, particularly if the Solicitor had preferences with regards to submission, format, or other specific requirements.

42. Despite numerous calls to the City Solicitor's office, with Counsel leaving messages seeking to speak with the City Solicitor, his Chief of Staff, or "any person responsible for False Claims Complaints," no contact was ever received from the City Solicitor or anyone at the City Solicitor's office.

43. Without any guidance or ability to contact the responsible persons, the complaint was submitted to the City Solicitor under a cover letter and sent via email (over five messages due to file size restrictions) and postal mail on October 17th, 2018.

44. The following weeks, Plaintiffs' Counsel attempted numerous times again to contact the City Solicitor or his office via phone, both to ensure receipt of the complaint and with the expectation that the City Solicitor would want to set up a meeting to discuss the complaint. These calls went unreturned.

*Summary Rejection and Lack of Good Faith Process*

45. Finally, on November 2nd, 2018, Plaintiffs' Counsel received a **six-minute** telephone call from Ms. Diana Cortes, whereupon she **summarily denied** the Plaintiffs' complaint on behalf of the City Solicitor, stating that "the False Claims Law did not apply" *without any further explanation or justification.*

46. During this short phone call, Plaintiffs' Counsel requested an explanation of the City Solicitor's reasoning behind its rejection and was advised that by Ms. Cortes "[she] didn't have the analysis memo in front of [her]" but that the law "did not apply to the [Parking Authority]."

47. It was evident from Ms. Cortes' demeanor and tone that the City Solicitor had—this early on and without adequate investigation or consideration—established their final position.

48. Further, the City Solicitor was not contacting Plaintiffs' Counsel for additional information or with further inquiry, but had made their final determination and were declining the complaint—as evidenced by Ms. Cortes refusing to provide any justification and the brief period of time allocated for discussion.

49. Seeking the City Solicitor's reconsideration, Plaintiffs' Counsel responded that he had done extensive research, and that the funds involved directly implicated City money due to the proceeds that would be due to the City.[7] Further, at this point, Plaintiff requested a meeting to discuss these issues, which was ignored.

50. Ms. Cortes advised that Plaintiffs' Counsel that he should "send [his] legal authority" despite Plaintiffs' Counsel's protests that he could not provide authority without understanding the City's reasons for rejection.

51. These protests were memorialized in an email from Plaintiffs' Counsel to Ms. Cortes on November 5th, 2018, where he requested the memo so that he could properly respond to the City Solicitor's concerns.

---

[7] It should be noted that at that point Plaintiffs' Counsel was under the mistaken belief that the Philadelphia Parking Authority was a "state-controlled city agency." This misidentification, however, did not affect Counsel's correct analysis that the fraud implicated City money nor the application of the False Claims Ordinance thereupon.

52. Ms. Cortes responded via email dated November 6th, 2018, stating that the City Solicitor's office "reviewed the applicable legal authority thoroughly and concluded the [FCO] does not apply." Further, she renewed her insistence that Plaintiffs' Counsel share "legal authority" to "assess on whether anything was overlooked or misinterpreted" without providing the context necessary to rebut the City Solicitor's conclusions.

53. Counsel for the Plaintiffs responded via email on November 7th, both attempting to placate Ms. Cortes and seek the additional information to properly respond, stating that he was "assuming that [he] must have missed something that your attorneys did not" and further "I can't provide you with additional legal authority/analysis because you've only told me that the [FCO] doesn't apply—not why . . . you're asking me to guess at the legal issues that resulted in the City's conclusion."

*City Solicitor Finally Provides Some Justification*

54. After a week without response from Ms. Cortes or the City Solicitor's office, Plaintiff's Counsel followed-up via email on November 15th, 2018, which precipitating a (now seventeen-minute) phone call at the end of that day.

55. During that rather contentious phone call, Ms. Cortes and Plaintiffs' Counsel established positions identical to their emails: Ms. Cortes claimed the False Claims Ordinance did not apply and for Plaintiffs' Counsel to provide legal authority to rebut that conclusion. Plaintiffs' Counsel stated that he could not rebut those conclusions without some basis to understand what the issues were.

56. Plaintiffs' Counsel advised that if the City Solicitor was unsure of the merits of the claim, *designation rather than denial* was the appropriate outcome. The claim could then proceed without risk to the City, as the issues that Ms. Cortes were discussing were matters of law that should decided before a judge.[8]

57. Plaintiffs' Counsel specifically further stated that Ms. Cortes' rejection was like "being forced to respond to preliminary objections without being permitted to see opposing counsel's brief." Ms. Cortes denied this, and claimed that that wasn't an appropriate analogy because "we [were] on the same side."[9]

58. Ms. Cortes stated that she was uncomfortable with Counsel's questions, claiming "[she] felt as if [Plaintiffs' Counsel] was trying to box her in."

59. Plaintiffs' Counsel replied affirmatively—that "[he was] trying to box [her] in,"—because he was concerned that if he addressed those issues the City Solicitor would just create new ones and continue to "shift the goal posts" so that they could continue to deny the claim, as they had seemed to have already made up their mind.[10]

60. Ms. Cortes took offense to that comment and stated that wasn't the case and claimed that she was being fair. Counsel apologized if he offended her, but advised he needed to look out for his clients' interests.

---

[8]This was particularly relevant as the City Solicitor's refusal to use the FCO has resulted in nearly nonexistent case law on the ordinance and issue that Ms. Cortes was attempting to raise.

[9]The irony of Ms. Cortes' comment was not lost on Plaintiffs' Counsel: it was apparent from the beginning that the City Solicitor and Plaintiffs' Counsel were not on the 'same side,' but rather the City Solicitor had made a politically convenient decision that they were determined to justify, despite the clear fraud against the City and merit of the claim.

[10]Perhaps presciently, "moving the goal posts" was exactly the strategy of the City Solicitor, and each time an obstacle they presented was overcome, they erected a new obstacle to justify their predetermined outcome.

61. However, finally, Ms. Cortes identified the two issues that the City Solicitor had with Plaintiffs' complaint, prompting Plaintiffs' Counsel to ask if there were any other issues, and further assurances that if he were able to adequately address these issues the complaint would move forward.

62. Plaintiffs' Counsel then read-back the two discussed issues to Ms. Cortes, who both corrected the wording of the first and confirmed that those were the only issues the City Solicitor identified with the complaint. Plaintiffs' Counsel further memorialized these issues in an email to Ms. Cortes on November 17th, 2018, which she did not respond to.

63. Plaintiffs' Counsel thereafter researched the issues raised, and both wrote a response to the City Solicitor which fully details why the FCO applied, as well as amended his complaint to fully address the City Solicitor's concerns which was sent via email on December 27th, 2018.

64. Again, Plaintiffs' Counsel followed-up repeatedly with Ms. Cortes, who finally suggested a meeting including herself, Plaintiffs' Counsel and Ms. Ewing, who was Chief of the Affirmative & Special Litigation Unit for the City Solicitor's office.

*A Meeting to Reject the Claim on the same Pretext*

65. On January 29th, 2019, Plaintiffs' Counsel met with Ms. Cortes and Ms. Ewing. After an initial exchange of pleasantries, Ms. Cortes again denied the claim on the nexus of funds issue, turning to Ms. Ewing to explain.

66. Ms. Ewing began her explanation with the statement complementing the complaint, calling it a "good case" and further stating that "if this was against a City agency, [she] would take it in a minute."

67.   Ms. Ewing then went into an explanation of Ms. Cortes' denial, claiming that the fraud was only against Commonwealth—not City—monies, and therefore the False Claims Ordinance could not apply.

68.   Ms. Ewing stated that since the subject of the contract was the Red Light Cameras, which was pursuant to state legislation and under the authority of the Commonwealth, no money from that program implicated any of the City funds, and further that any penalties for Red Light would also go to the State, not City.

69.   In response, Counsel for Plaintiffs advised Ms. Ewing that she was misreading the statute (discussing 75 Pa. C.S. § 3116 (k) (1)): While all "fines" from the Red Light Camera program belong to the Commonwealth, the statute is silent on "penalties," therefore these monies would go into the Parking Authority's general fund.[11]

70.   Plaintiffs' Counsel explained that the False Claims Ordinance was meant to be "extremely broad and inclusive", and to "encompass any fraud against the City" which was supported by the Ordinance's clear language defining a claim to include any payment "if the City provides any portion of the money" (quoting FCO § 19-3601).

71.   Plaintiffs' Counsel stated that the Parking Authority is also a contractor under the definitions of the FCO, and that contractors and subcontractors were explicitly included by definition in the ordinance (discussing § 19-3601 (2)).

---

[11]This is also in accordance with how the Parking Authority accounted for penalties during the period they were withholding and prior to the point where the Parking Authority gave back all properly withheld penalties. Only fines—without any penalties—were reported to the Commonwealth, and all penalty monies—prior to being given back to Conduent—are believed to have been placed in their general fund.

72. Further, Counsel for Plaintiff stated that there was no legal support for the City's position that there wasn't a nexus of funds between the City of Philadelphia and the Philadelphia Parking Authority, and that if "one dollar" was fraudulently claimed against the City, that constituted an actionable False Claims.[12]

73. Finally, Plaintiffs' Counsel again repeated his contention that all assets of the Parking Authority will return to the City of Philadelphia at the expiration of its authorization, therefore the nexus of funds issue is immaterial, as all Parking Authority money and assets ultimately belong to the City.

74. The City's interest in the Parking Authority's assets has been explicitly addressed by the Pennsylvania Supreme Court, where they found that the limited term of the Parking Authority (under the Parking Authorities Law, 53 Pa. C.S.A. § 5505 (d) (1)) instructive: "Upon the termination of its existence, the assets of the Authority will pass to the City of Philadelphia. [53 Pa. C.S.A. § 5514 (d)]. Thus, within the foreseeable future, the City of Philadelphia is destined to acquire the assets of the Authority." *Price v. Parking Authority*, 221 A.2d 138, 144 (Pa. 1966).[13]

75. Notably, the lack of nexus of funds was the justification claimed by the City Solicitor and Ms. Cortes that "the FCA could not apply" and was again the reason that Ms. Cortes denied the claim at the onset of the meeting, despite the fact that Plaintiffs' Counsel was simply restating the position from his December 27th letter.

76. As the discussion the nexus of funds issue closed, neither Ms. Cortes nor Ms. Ewing disputed Plaintiffs' Counsels contention that he had satisfied the requirements of the FCO for jurisdiction.

---

[12]Counsel's statement was not completely correct, as the FCO bars actions "based upon one or more false claims with a cumulative value of less than ten thousand (10,000) dollars[.]" This mistake was harmless in the context of this conversation, as the fraud implicated is in the millions of dollars.

[13]Regrettably, only recently did Plaintiffs' Counsel learn of this specific holding.

77. However, Ms. Ewing then—for the first time—raised the issue of damages against the City, asking for an explanation of how the City was damaged by the fraud alleged in the complaint.

78. Plaintiffs' Counsel offered several alternatives in which the City was damaged, noting both that discovery and expert testimony would be needed to properly prove them, and also that there were likely other damages theories that would be revealed through litigation.

79. The first source of damages discussed by Plaintiffs' Counsel arose in the same manner as the nexus of funds, due to how Parking Authority internally accounts for its' overhead:

  (a) The Philadelphia Parking Authority administratively accounts by custom and informal agreement for its overhead by proportionately assigning it to different divisions, based on the division's total expenses.

  (b) The services provided for the City of Philadelphia (e.g. On-Street Parking, Airport Garages) are the most manpower-intensive for the Parking Authority, this places much of the burden of administration and overhead onto the City.

  (c) If the Parking Authority were to have a windfall (i.e. millions in contractual penalties), the City could make a good faith argument that the budgetary surplus should first go to pay overhead fees before any were charged to the City, thus increasing the revenue to the City and School District.

80. The second source of damages discussed by Plaintiffs' Counsel arose from the lost grants from the Commonwealth. Since Conduent's technology was incapable of performing to the contract requirements, the Commonwealth was not receiving as much in fines as it should. Since the fines went into a Commonwealth fund for transportation grants, it could be shown that Conduent and the Parking Authority's procurement fraud potentially resulted in millions of lost transportation grants.

81. A brief discussion ensued regarding the possibility of transportation grants and how they were not guaranteed and thus would not be appropriate for damage, however Plaintiffs' Counsel advised that since the statute gave priority to the municipality hosting the cameras, those lost grants were properly 'lost opportunity' damages.[14]

82. Ms. Ewing raised a point that to her understanding that the Parking Authority paid its' statutory cap to the City of Philadelphia general fund each year from On-Street parking, and that all further monies go to the School District of Philadelphia, which is a separate entity.[15]

83. Plaintiffs' Counsel rebutted that concern noting that the City of Philadelphia still pays additional money annually to the schools, and that "each dollar paid to the School District by Parking Authority was a dollar that the City wasn't required to contribute" thus any damages to the School District were also indirect damages to the City.

84. Throughout the conversation on damages, Plaintiffs' Counsel repeatedly advised that not only did damages exist—which proved to be true with very little research—but they could be and only would be fully revealed in litigation.

85. By the close of the conversation on damages, no indication was given that Plaintiffs' Counsel and the City Solicitors' representatives were participating in anything other than a 'brain-storming' session as to what the possible sources of damages might be; neither Ms. Cortes and Ms. Ewing made any comments regarding additional concerns over a lack of damages.

---

[14] Plaintiffs' Counsel did not use the terminology 'lost opportunity' but instead described the concept, being completely unable to recall the correct terminology at the time.

[15] However, this statement is incorrect. The City has been underpaid $3 million annually by the PPA. *See* ¶¶ 36–37 *supra*. While it was unknown at the time of the meeting, it is easily proven that the fraud alleged in the Plaintiffs' complaint resulted in direct fiscal harm to the City. Further, had Plaintiffs' Counsel been advised that damages were an issue—or the corollary the the City Solicitor was now creating new issues beyond the two they previously claimed—he would have been prepared to show this loss by the City.

86. During the discussion on damages, Plaintiffs' Counsel observed further that the liability here was so obvious that the primary Defendant would likely immediately settle rather than face trebled damages or debarment by the City—particularly if it could do so confidentially.

87. This was the first time that Ms. Cortes seemed to even take Plaintiffs' allegations seriously, as both her and Ms. Ewing immediately reviewed the Philadelphia Code to see if the City could settle on confidential terms.[16]

88. Ms. Ewing then specifically asked if Plaintiff's counsel was aware that the City Solicitor could not only adopt the complaint but could also designate an attorney to act on behalf of the City, and further if Plaintiffs' Counsel was interested in that arrangement.

89. These statements were understood as Ms. Ewing's approval of the case as explained, and her belief that the case should move forward and Plaintiffs' Counsel responded in the affirmative to both questions, noting that he had been suggesting designation "since November".

90. Interestingly, Ms. Ewing was the attorney who should have been handling Plaintiff's proposed complaint all along, as she was the attorney who would have directly supervised any FCO litigation within their office, and—unlike Ms. Cortes—seemed to have a strong understanding of the ordinance and the necessary elements.

91. However when Ms. Ewing was finally brought into the conversation about Plaintiffs' proposed complaint at this meeting, it appeared that she had only recently been provided the document for review.

92. At the meeting, Ms. Ewing seemed to be brought into the conversation as an expert that would backstop Ms. Cortes' justifications for rejection.

---

[16]Throughout Plaintiffs' efforts to move this case forward, Ms. Cortes and the City Solicitor's office have always seemed more concerned with possible publicity rather than the merits of the claim.

93. Unexpectedly, Ms. Ewing did not ultimately support her superior's decision, and indicated not only her approval of Plaintiffs' case but also her opinion that this claim was appropriate for designation.

94. Ms. Cortes was obviously taken by surprised and looked uncomfortable at Ms. Ewing's questions regarding designation. She then suggested that she and Ms. Ewing "needed to meet to discuss this tomorrow or the next day," and abruptly ended the meeting allegedly due to her schedule.

95. Prior to Ms. Cortes leaving, Plaintiffs' Counsel specifically noted that he was aware that the False Claims Ordinance permitted the City Solicitor to "do nothing" and stated plainly that he did not believe that was a "legal or ethical option available to the City."

96. Ms. Cortes did not deny or respond directly to Plaintiffs' Counsel's point, but instead was quick to respond that "the City Solicitor can also take other action" as well, seeming well-prepared to justify some 'other action' that might result in the same Do Nothing result.

97. Plaintiffs' Counsel then reminded them of his pending statute of limitations, and requested they get back to him by Friday afternoon (three days later). Ms. Cortes and Ms. Ewing agreed, and made assurances they would get back to him by then.

98. On Friday, February 1st, 2019, Ms. Cortes emailed Plaintiffs' Counsel advising that they had not been able to meet and that they would respond early the following week. Plaintiffs' Counsel responded on Monday morning that he wanted an answer by the close of business that Wednesday.

*Attempted Appeal to the Mayor*

99. With no response from the City Solicitor by the extended deadline, Plaintiffs' Counsel drafted a letter to the Mayor, detailing the extenuating process and the quickly approaching deadline, and requesting that the Mayor intercede and direct the City Solicitor to designate Plaintiffs' Attorney so that the claim could move forward, which was sent via email on February 6th.

100. The Mayor's involvement with individuals named and implicated in Plaintiffs' proposed complaint was well-known to Plaintiffs, however they wanted to provide the opportunity for the Mayor to 'do the right thing' in the unlikely event that the City Solicitor was acting without his knowledge or authority.

101. On February 7th, 2019, after several calls to the Mayor's office and his Chief of Staff, Plaintiffs' Counsel was advised by the Mayor's Chief of Staff, James Engler: "I understand you have already met with attorneys with the [City Solicitor's office], and they will be responding to your request."

102. Plaintiff's Counsel immediately responded to Mr. Engler's email that the City Solicitor had not been handled the issue appropriately and stated that Mayoral intervention was required. This email was ignored.

*Final Pretextual Denial for an Element Not Required by Law*

103. On February 8th, 2019, after two days without any of the promised response from the City Solicitor, Plaintiffs' Counsel again emailed Mr. Engler, advising him that no-one had yet followed up with him and that he had an interview with the Philadelphia Inquirer on Monday regarding this issue.

104. Thirty-three minutes later, Plaintiffs' Counsel received a final denial letter via email from Ms. Cortes, on behalf of the City Solicitor. *Ex. B.*

105. In that letter, Ms. Cortes formally declined to either adopt the complaint and bring the action or designate Plaintiffs' Counsel to move forward on the City's behalf, and instead electing by implication that the City Solicitor has chosen to Do Nothing. *Ex. B* at ¶ 1, 5.

106. Ms. Cortes further states that "this denial does not prejudice the ability of any City agency to further investigate these allegations or similar allegations in the future through other channels or sources of authority." *Ex. B* at ¶ 6.

107. However, Ms. Cortes statement does not accord with the FCO, which provides the Relators' the same share of any proceeds recovered based upon their complaint. §19-3603 (5).

108. Further, the sole justification contained in Ms. Cortes' final rejection letter is a lack of damages either due to Plaintiffs' Counsel "not produc[ing] evidence", *Ex. B* at ¶ 2, "too speculative", *Id.* at ¶ 3, or that the School District, not City, was the one damages, *Id.* at ¶ 4, all related to the brainstorming discussion regarding damages on January 29th.

109. However, Ms. Cortes significantly misinterprets the False Claims Ordinance, as she is creating a new element not required by law: damages.

110. The False Claims Ordinance applies to "any request or demand" for money, § 19-3601 (1) (definition of "Claim"), and three of the seven defined prohibited acts are inchoate, and may be violated in the attempt, § 19-3602 (1)-(3), as long as the attempt or attempts have a cumulative potential fraud of "$10,000" or more, § 19-3603 (3).

111. Further, penalties are provided by the FCO in addition to trebled damages, as this addresses potential inchoate acts: Each violation of the Ordinance provides for a maximum $2,000 fine as a "Class III Offense ... set forth in [Philadelphia Code] § 1-109 (3)". FCO § 19-3602.

112. As a result, Ms. Cortes, acting on behalf of the City Solicitor, was erroneously interpreting a statute, and her denial of Plaintiffs' claims was entirely unsupported by law.

113. Further, as the City does have direct damages as a result of the PPA's underpayments, Ms. Cortes' denial of Plaintiffs' claims is additionally entirely unsupported by fact.

### Political Expediency not Merit

114. Plaintiffs' proposed complaint was not evaluated fairly based upon the merits. Instead, Defendants were more concerned with the potential political or personal ramifications of the alleged fraud coming to light for senior members of the Philadelphia government, including Mayor James Kenney, former-Mayor Michael Nutter[17], and numerous members of City Council.

115. The inclusion of Mr. Vincent Fenerty was politically problematic, as Mr. Fenerty was the Executive Director of the PPA for more than a decade, and was the primary source of non-civil service (*i.e.* patronage) jobs within the City, which along with his agency's budget, he used to curry influence throughout the City.

116. Upon information and belief, Mr. Fenerty has also done extensive favors for numerous individuals in the City, from 'fixing tickets' to extortion and bribery of members of City government.

117. In particular, Mayor Kenney's relationship with a Mr. Fenerty has been ongoing for more than a decade, where both Mayor Kenney and Mr. Fenerty have engaged in political *quid pro quo* beginning while Mayor Kenney was a City Councilman-at-Large in Philadelphia.

---

[17]Mayor Nutter was appointed to Conduent's Board of Directors exactly one year after leaving office, during which time Conduent was awarded the renewal contract with PPA. During Mayor Nutter's tenure, numerous contract awards were made to Conduent by City and Commonwealth entities in the Philadelphia region.

118. Upon information and belief, both Mayor Kenney and Mr. Fenerty have information that would expose the other to potential criminal and civil penalties for their actions, including misappropriation of funds, honest services theft, insurance fraud and other corrupt acts.

119. Upon information and belief, these acts include Mayor Kenney illegally tampering with the life insurance benefits for a city employee, where he arranged to have beneficiary information removed from the file of a deceased firefighter, who had designated his life insurance go into trust for his children, rather than his estranged wife.

120. Upon information and belief, Mayor Kenney arranged for this paperwork disappearance as a favor to Mr. Fenerty, who was at the time involved in a relationship with the decedent's spouse, so that she would receive the life insurance money rather than the children's trust.

121. Besides Mr. Fenerty, two major political allies of Mayor Kenney would also be implicated and/or impacted by Plaintiffs' proposed lawsuit: Mr. Joseph Ashdale and Mr. John "Johnny Doc" Dougherty, both close political and personal allies of the Mayor.

122. A significant beneficiary of the Conduent contract with the PPA was Mr. John Dougherty. Upon information and belief, workers from his union, Local 98, were hired to perform the installation and other work associated with the Conduent Red Light equipment.

123. Mr. Doughtery is well-known to be an ardent supporter of the Mayor, and he and his union are major financial contributors to the Mayor.

124. Further, Mr. Dougherty's sister-in-law, Ms. Lisa Dougherty, was hired as Red Light project manager, the senior Conduent employee within that program—despite a lack of qualifications—largely to ensure income and life insurance to her family while her husband ran for elected office in the Commonwealth.

125. Local 98 and Mr. Dougherty were able to reap these benefits from the Conduent contract as Mr. Fenerty was given direct control over hiring for Conduent's Red Light employees within Philadelphia, which provided him with another pool of patronage jobs to use to extend his influence.

126. Similarly, Mayor Kenney and Mr. Ashdale also have a close personal and political relationship, mainly due to Mr. Ashdale's control of a different union, District Council 21, another major contributor to the Mayor.

127. Mr. Ashdale and Mr. Fenerty were recently implicated in the extortion and bribery of members of Philadelphia City Council to 'kill' a City audit of the PPA in 2016, by threatening to withhold PPA jobs and contracts from anyone who supported the audit, as well as through $3,000 in materials being given from DC21 as *quid pro quo* to a Councilman's Chief of Staff.

128. Not coincidentally, the effort to kill this City audit was concurrent to Mr. Fenerty's internal audit of the Conduent contract which revealed that Conduent owed the PPA in excess of $25 million, and further would have revealed the extensive underpayments by the PPA to the City of Philadelphia (and School District of Philadelphia).

129. Mayor Kenney's extensive relationship with individuals in the PPA also allowed him to recommend a senior member of his administration, Ms. Clarena Tolsen, to become interim Executive Director after Mr. Fenerty resigned.

130. Despite being advised of the multitude problems with Conduent's Red Light program, Ms. Tolsen not only chose to ignore those problems but allowed Conduent's contract to be renewed, and further directly approved the retaliatory termination of Plaintiff Dankanich from the PPA.

131. The extensive scope of the corruption directly implicates not only employees of PPA including named defendants like Mr. Fenerty and Mr. Hoch, but also into the Mayor's Office of Philadelphia, and the majority of the City Council that voted against the 2016 PPA audit.

132. As a result, the City Solicitor's office was either explicitly or implicitly knew that Plaintiff's proposed complaint was too politically sensitive to move forward, despite its merit.

133. Upon information and belief, this political sensitivity was the reason that Ms. Diana Cortes was assigned to handle Plaintiffs' complaint, as she was politically reliable despite her initial and ongoing lack of understanding of the City's FCO, and the availability of her more appropriate- and knowledgeable- subordinate, Ms. Ewing.

134. Upon information and belief, political expediency was also the underlying and actual reason for the repeated pretextual rejections of the Plaintiffs' complaint, despite its clear merit.

*Claim of Confidentiality Restricting Plaintiffs' Speech*

135. Upon notifying the Defendant Pratt and Ms. Cortes that Plaintiffs' intended to file this lawsuit for constitutional violations, Plaintiffs' Counsel was contacted via email by Defense Counsel stating:

> [A]s you are aware, any information shared with the City in support of a proposed complaint is confidential under the False Claims Ordinance. FCO § 19-3606(2)(c) [sic]. That would obviously include the discussions you had with the City Solicitor's office that you purport to quote in your complaint against the City and the City Solicitor, as well as the information you plan to include in the proposed complaint against the Parking Authority and other parties, which you apparently plan to file publicly. Our clients demand that whatever you file with the court complies with the confidentiality restrictions of the FCO. Your current proposed filings do not.

136. Plaintiffs' Counsel attempted to explain there was no entitlement to confidentiality under the FCO, nor any privilege that exists between a relator and the government, however was advised "the City has made clear to you its position and you will proceed at your own risk."

137. Plaintiffs' Counsel then elected to heed the Defendants' stern warning and filed this lawsuit under seal as they required.

138. Upon information and belief, it is due to the Defendants' claim of confidentiality that so little information exists in the public record about previous FCO complaints submitted by private persons.

## CAUSES OF ACTION

### Count # 1

### Unconstitutionality of Do Nothing Option

U.S. Const. amend. XIV, § 1, Pa. Const. Art I §§ 1, 11.

139. Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

140. Defendant City of Philadelphia is a "person" under § 1983 and *Monell v. Dept. of Soc. Svcs. of City of New York*, 436 U.S. 658 (1978).

141. Defendant Marcel Pratt, in his official capacity as City Solicitor of Philadelphia, is responsible for the execution of the FCO.

142. The FCO is an ordinance of the City of Philadelphia, and any actions taken by persons are therefore under 'color of law' under 42 U.S.C. § 1983.

143. The False Claims Ordinance ("FCO") was enacted by Philadelphia City Council in 2010 to "fight fraud [and] raise money for the City" through enhanced penalties but "most importantly [to] encourag[e] those with knowledge of fraud by protecting them [and] providing financial incentives." Transcript of 12/16/2009 Hearing for Cmte. on Law and Govt., Phila. City Council (Statement of Councilman William Greenlee, Chair and Bill Sponsor) at 3:9-11, *Id.* (Statement of Amy Kurland, Philadelphia Inspector General) (emphasis added) at 6:13-17.

144. The FCO is "whistleblower" law "based pretty much on the federal regulations", *Id.* (Statement of Councilman Greenlee) at 3:7-9, with the filing scheme changed to accommodate the City Council's lack of control over Pennsylvania Courts, *See generally,* FCO  19-3603 (2), compare 31 U.S.C.  3730 (b).

145. However, the FCO  19-3603 (2) (b) (.3) allows the City Solicitor to "Decline to commence a civil action and decline to designate the person who submitted the proposed complaint to commence a civil action" or functionally 'Do Nothing.'

146. This Do Nothing option for the City Solicitor is mutually exclusive to the other three options available under  19-3603 (2) (b).

147. There is no reason the Do Nothing option could rationally further the City's legitimate interest in fighting fraud, raising money for the City, or encouraging whistleblowers to come forward with information of fraud.

148. The actual reason for the Do Nothing option was to provide City leadership with an 'out' if they were ensnared in the FCO.

149. At the time of enactment, corruption within and against the City was rampant, with many members of Council and the City Executive potentially implicated in unethical and illegal activities, a pattern which continues today.

150. The Do Nothing option was implemented to protect those individuals in City Hall from the potential penalties that could arise for their illegal and corrupt behaviors.

151. The City Solicitor is implicitly and/or explicitly aware of the corruption within the City government, including among members of the Council and the City leadership.  As he 'works' for both the Council and the Mayors office, and it is against his self-interest to allow FCO claims to go against those individuals or anyone who might be associated with them.

152. As a result, the City Solicitor either can not or will not allow meritorious claims to move forward against certain individuals who are 'protected'.

153. Many potential claims under the FCO would be against these 'protected' persons—including City leadership and Council members—as these are the persons most likely- and able-to defraud the City or participating in a conspiracy to do so.

154. The Do Nothing option therefore interferes with—rather than advances—the only legitimate interest of the FCO: to "fight fraud" and "raise money for the City" as it disincentivizes relators from coming forward with information and makes it less likely that an attorney will assist a relator in presenting a complaint to the City Solicitor.

155. No other implementation of the FCO—in over 30 states and 9 municipalities—permits the level of unbridled discretion on the part of the government, as it serves no legitimate purpose, and only permits corrupt and self-dealing individuals from ensuring they escape potential penalty.

156. The Do Nothing clause is therefore unconstitutional under the 14th Amendment of the United States Constitution and Article I §§ 1, 11 of the Pennsylvania Constitution.

157. The Philadelphia Code contains a Severability Clause, § 1-106, which permits Courts to strike unconstitutional sections of the Code "if any provisions or applications are illegal."

158. As the Do Nothing option of the FCO is unconstitutional, therefore the FCO § 19-3603 (2) (b) (.3) must be struck from the Philadelphia Code.

## Count # 2

## Lack of Due Process

U.S. Const. amend. XIV. § 1, Pa. Const. Art I §§ 1, 11,
Pa. Local Agency Law, 2 Pa. C.S. § 101 *et seq.*

159. Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

160. Defendant City of Philadelphia is a "person" under § 1983 and *Monell v. Dept. of Soc. Svcs. of City of New York*, 436 U.S. 658 (1978).

161. Defendant Marcel Pratt, in his official capacity as City Solicitor of Philadelphia, is responsible for the execution of the FCO.

162. The FCO is an ordinance of the City of Philadelphia, and any actions taken by persons are therefore under 'color of law' under 42 U.S.C. § 1983.

163. The FCO creates a property interest for relators bringing forth "Civil Actions for False Claims", § 19-3603 (2), through financial incentives for private individuals with knowledge of fraud against the City to bring them forward, § 19-3603 (8).

164. The relators property interest is created at the moment that a complaint is submitted to the City Solicitor, as that is the moment that the entitlement attaches to the relators' actions, and it imparts a legitimate expectation that a relator "shall be entitled" to a portion of the proceeds, and thus creating an entitlement. *Id.*

165. Further supporting a relator's property interest, if the City Solicitor pursues an alternative remedy (or "alternative action" based upon the relator's complaint) the relator is still entitled to share in the proceeds on the same percentage basis as if it were a civil action. FCO § 19-3603 (5).

166. No government, including the City, may deprive Plaintiffs' of a property interest without "due process of law., which is understood to mean—at minimum—Plaintiffs are entitled

to notice and a hearing. *See Mathews v. Eldridge*, 424 U.S. 319, 333 (1976), *Goldberg v. Kelly*, 397 U.S. 254, 271 (1970).

167. The City Solicitor neither had nor offered any process to the Plaintiffs to protect their rights under the FCO.

168. The City Solicitor made their final decision prior to their initial six-minute phone call to Plaintiffs' Counsel, without adequate investigation, notice, or hearing, and all actions since have been attempted *post hoc* pretexual rationalization for their predetermined decision.

169. To the extent that the City Solicitor may claim any "process" existed:

(a) it was facially arbitrary and capricious, and existed solely to provide pretext to return to the City Solicitors predetermined and politically convenient rejection;

(b) it was opaque to Plaintiffs, failing to provide adequate notice to allow them to fully defend, particularly as to the newly raised issue of 'damages';

(c) it did not constitute the necessarily impartiality akin to a "judicial proceeding" necessary to terminate Plaintiffs entitlement.

(d) it did not comply with the necessary due process requirements under Pennsylvania's Local Agency Law, 2 Pa. C.S. § 101 *et seq.*

170. As the City Solicitor terminated Plaintiffs share of the award proceeds after that right was vested, without any adequate process or hearing to protect Plaintiffs' entitlement, that was a violation of Plaintiffs' due process rights under the 14th Amendment of the U.S. Constitution and Article I §§ 1, 11 of the Pennsylvania Constitution.

**Count # 3**

**Improper Motive for Rejection**

U.S. Const. amend. XIV. § 1, Pa. Const. Art I §§ 1, 11.

171. Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

172. Defendant City of Philadelphia is a "person" under § 1983 and *Monell v. Dept. of Soc. Svcs. of City of New York*, 436 U.S. 658 (1978).

173. Defendant Marcel Pratt, in his official capacity as City Solicitor of Philadelphia, is responsible for the execution of the FCO.

174. The FCO is an ordinance of the City of Philadelphia, and any actions taken by persons are therefore under 'color of law' under 42 U.S.C. § 1983.

175. The FCO creates a property interest for relators bringing forth "Civil Actions for False Claims", § 19-3603 (2), through financial incentives for private individuals with knowledge of fraud against the City to bring them forward, § 19-3603 (8).

176. The Relators property interest is created at the moment that a complaint is submitted to the City Solicitor, as that is the moment that the entitlement attaches to the relators' actions, and it imparts a legitimate expectation that a relator "shall be entitled" to a portion of the proceeds, and thus creating an entitlement. *Id.*

177. Further supporting a relator's property interest, if the City Solicitor pursues an alternative remedy (or "alternative action" based upon the relator's complaint) the relator is still entitled to share in the proceeds on the same percentage basis as if it were a civil action. FCO § 19-3603 (5).

178. No government, including the City, may deprive Plaintiffs' of a property interest for reasons that are "arbitrary, irrational, or tainted by improper motive," *Woodwind Estates, Ltd. v.*

*Gretkowski*, 205 F.3d 118, 123 (3rd Cir. 2000), or "by means of government conduct so egregious that it shocks the conscience," *Nicholas v. Pa. State Univ.*, 227 F.3d 133, 139 (3rd Cir 2000).

179.  Here however, the City Solcitor predetermined their rejection based upon political expediency due to well-known relationship that existed between and among individuals named and implicated in the Plaintiffs' proposed complaint and the City Solicitor's boss, Mayor James Kenney.

180.  Instead of evaluating the fraud fairly on the merits, the City Solicitor immediately determined that this complaint could not move forward and has been attemping to 'kill' it through one pretextual–and incorrect–justification after another.

181.  In order to ensure that this claim could not be fairly evaluated, the City Solicitor assigned a Ms. Cortes, a very senior and politically reliable attorney—without any apparent knowledge of the FCO—to reject the claim.

182.  Ms. Cortes attempted to accomplish the City Solictiors improper goal in a six-minute phone call rejecting the claim without justification.

183.  Instead of meekly accepting rejection, Plaintiffs via their attorney have disproven every justification that Ms. Cortes has attempted to use as a pretext to deny Plaintiffs' complaint.

184.  The reason Plaintiffs have been able to accomplish this is simple: Their claim is meritorious. The PPA, Conduent, Mr. Fenerty and others have actively defrauded the City of millions of dollars.[19]

185.  The City Solicitor is aware the complaint is meritorious and would not only survive Pre-

---

[19]The City Controller is actively conducting an audit of the PPA that Plaintiffs were instrumental in assisting, which will detail the fraud alleged in their complaint and the extensive financial losses the City has suffered as a result.

liminary Objections but result in a verdict: This is why it is essential to the City Solicitor that he be permitted to Do Nothing with Plaintiffs' complaint.

186.   The Do Nothing option was included as an 'escape hatch' for FCO liability for members of the City leadership, such as Mayor Kenney, so that liability can not attach to individuals too senior or otherwise important to be subject to the law—exactly how it is being used.

187.   The City Solicitor's actions in improperly rejecting Plaintiffs' proposed complaint is a violation of their due process rights, as it is 'arbitrary, irrational, and tainted by improper motive' and further the willingness to protect corrupt individuals for the purposes of political expediency should 'shock the conscience' of any reasonable person.

188.   As the City Solicitor had improper motives in their denial of Plaintiffs' complaint, that was a violation of Plaintiffs' due process rights under the 14th Amendment of the U.S. Constitution and Article I §§ 1, 11 of the Pennsylvania Constitution.


**Count # 4**

**Violations of Plaintiffs' Free Speech**

U.S. Const. amend. I, Pa. Const. Art. I §7.

189.   Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

190.   Defendant City of Philadelphia is a "person" under § 1983 and *Monell v. Dept. of Soc. Svcs. of City of New York*, 436 U.S. 658 (1978).

191.   Defendant Marcel Pratt, in his official capacity as City Solicitor of Philadelphia, is responsible for the execution of the FCO.

192.   The FCO is an ordinance of the City of Philadelphia, and any actions taken by persons are therefore under 'color of law' under 42 U.S.C. § 1983.

193. The FCO contains a 'confidentiality' clause, § 19-3603 (2) (c) which states: "Information submitted by a person in support of a complaint, and information gathered as a result of the City Solicitor's of other City officer's investigation of the complaint, shall be confidential and protected from disclosure to the fullest extent permitted under applicable law."

194. The City Solicitor has interpreted this clause to mean that any information shared with the City Solicitor must be held in confidentiality upon "risk" of some unknown penalty.

195. The information the City Solicitor "**demands**" be held confidentially include the proposed complaint, and any "discussions" or communications made with the City Solicitor's staff.

196. The confidentiality clause, on its face and as applied, is irrational and unreasonable, and imposes unjustifiable restrictions on the exercise of protected constitutional rights.

197. The confidentiality clause, on its face and as applied, is an unconstitionally overbroad and a unconstitionally vague restriction of expressive activity.

198. The confidentiality clause, on its face and as applied, is neither narrowly tailored nor the least restrictive means to accomplish any permissible government purpose sought to be served by the legislation.

199. The confidentiality clause, as interpreted by the City Solicitor, is an unconstitutional violation of Plaintiffs'- and any other potential relators'- right to free speech under the 1st Amendment of the United States Constitution.

200. The Philadelphia Code contains a Severability Clause, § 1-106, which permits Courts to strike unconstitutional sections of the Code "if any provisions or applications are illegal."

201. As the confidentiality clause is overbroad, vague, and unconstitutionally interferes with the 1st Amendment of the U.S. Constitution's right to free speech, and therefore the FCO § 19-3603 (2) (c) must be struck from the Philadelphia Code.

## Count # 5

## Judicial Review *De Novo*

Pa. Const. Art. 5 § 9
Pa. Local Agency Law, 2 Pa. C.S. § 101 *et seq.*

202.   Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

203.   In the alternative, Plaintiffs' plead for judicial review *de novo* under the Pennsylvania Local Agency Law, 2 Pa. C.S. § 101 *et seq.*

204.   Defendant Marcel Pratt is the City Solicitor, and the ultimate head of the City Solicitor's office for the City of Philadelphia. That office is a "Local Agency" as defined under 2 Pa. C.S. § 101 as a "government agency other than a Commonwealth agency."

205.   The rejection letter dated Feburary 8th, 2019 was 'final', in writing, and served to Plaintiffs' via their counsel by electronic mail.

206.   The final rejection letter constituted an "adjudication" as defined by 2 Pa. C.S. § 101 as "[a]ny final order, decree, decision, determination, or ruling by an agency affecting personal or property rights, privileges, immunities, duties, liabilities or obligations of any or all of the parties to the proceeding in which the adjudication was made."

207.   Plaintiffs have exhausted their administrative remedies, and no other means of appeal exist.

208.   Plaintiffs' have alleged violations of the FCO in their proposed complaint that meet the necessary standard of pleading and make a *prima facie* claim against the named Defendants.

209.   The City Solicitor presents as their sole remaining reason for rejection of Plaintiffs' claim as a 'lack of damages'. This is incorrect both factually and as a matter of law:

    (a)   damages are not required under the FCO, as the ordinance carries statutory penalties and applies to inchoate acts.

38

(b)   ample evidence of damages to the City exist, including $3 million withheld annually from the City, and other direct and indirect damages. *See* ¶¶ 36–37, 78–84 *supra*.

210.   This Court may hear the appeal of this adjudication *de novo*, without respect to the Defendants' underlying proceedings or determination, under 2 Pa. C.S. § 754.

211.   Further, the irregularities in the City Solicitor's investigation and adjudication cast their judgment and motives into question, as Plaintiffs' are entitled to a fair and impartial decision-maker.

212.   As the City Solicitor's decision was facially incorrect and their motives are suspect, it is both appropriate and necessary for this Court to substitute it's judgment in place of the City Solicitor's determination.

213.   Plaintiffs' should be designated by the City of Philadelphia to file a civil action on the City's behalf to pursue this fraud and recover wrongfully claimed monies from the City.

## Count # 6
## Breach of Contract
*Greene v. Oliver Realty, Inc.*, 526 A.2d 1192 (Pa. 1987).

214.   Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

215.   A unilateral contract is created when one party makes a promise in exchange for the other persons act or performance. The act which constitutes the offeree's performance also forms the contract and obligates the offeror to fulfill the terms of its offer. *Greene v. Oliver Realty, Inc.*, 526 A.2d 1192 (Pa. 1987).

216.   The FCO solicits information from "Private Persons" who have information about fraud or false claims made against the City, creating an offer to the public.

217. The means to accept this offer is also explicitly provided by the FCO: submission of a "signed and verified" complaint to the City Solicitor.

218. At the moment that complaint is submitted; Private Persons have fulfilled the terms of this contract, as they have provided information—under penalty of perjury—regarding False Claims to the City.

219. The Defendants unilaterally determined the value of the bargain for Private Persons, defining it as a percentage of the City's proceeds, an unliquidated sum that requires additional action by the City to convert to an actual cash value.

220. Therefore, it is understood and expected that Defendants are obligated to pursue- or allow those Private Persons to pursue- the necessary judgment or settlement to determine an actual cash value of the Plaintiffs benefit for performance.

221. Here, the Plaintiffs had information solicited by the City of Philadelphia, and have performed specifically in accordance with the terms of the offer, creating a unilateral contract.

222. The Plaintiffs'—having fulfilled their obligations—now are entitled to the benefit of this unilateral offered contract: a share of the cash proceeds from the City Award.

223. Only the City's obligations under this Contract remain: to pursue- or allow Plaintiffs to pursue the fraud contained in the complaint, which will determine an actual cash value for the currently unliquidated damages.

224. Defendants claim, without any support, that Plaintiffs' expected benefit has no value, despite evidence in the signed and verified complaint of millions in fraud.

## Count # 7

## Quasi-Contract

*Wiernick v. PHH U.S. Mortgage Corp.*, 736 A.2d 616 (Pa. Super. Ct. 1999).

225. Plaintiffs incorporates by reference ¶¶ 1 to 138 above as if fully set forth herein.

226. Unjust Enrichment is an equitable quasi-contract doctrine requiring: (1) benefits conferred on defendants by plaintiffs; (2) appreciation of such benefits by defendants; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable for defendants to retain the benefit without payment of value. *Wiernik v. PHH U.S. Mortgage Corp.*, 736 A.2d 616, 622 (Pa.Super.Ct. 1999), *appeal denied*, 561 Pa. 700, 751 A.2d 193 (2000).

227. Plaintiffs possessed "whistleblower" information regarding fraud against the City of Philadelphia; this information was unknown and benefit to the City.

228. The information is such a valuable to the City that they created the False Claims Ordinance, specifically and "most importantly" to incentivize whistleblowers to come forward.

229. In creating the False Claims Ordinance ("FCO"), Philadelphia City Council acknowledges that this benefit is valuable and appreciable by the City.

230. The Defendant City of Philadelphia authorized a specific means to convey this information to the City by ordinance, submission of a "signed and verified" proposed complaint to the City Solicitor.

231. Plaintiffs, via their attorney, conferred this benefit of their valuable information onto the Defendant City of Philadelphia via Marcel Pratt.  This benefit was received and both presumptively appreciable and actually appreciated by the City.

232. This valuable benefit of information about fraud was accepted and retained by the Defendants City of Philadelphia while simultaneously denying Plaintiffs without payment of value (in the form of a share of the award proceeds).

233. Further, the City Solicitors' statement "this denial does not prejudice the ability of any City agency to further investigate these allegations or similar allegations, *Ex. B* at ¶ 6.

234. The City Solicitor demonstrates that this information had value, and further shows the City Solicitor is retaining the benefit despite the Plaintiffs' clear and reasonable expectation of value in return for this benefit, as supported by the text of the FCO.

235. The retention of this benefit conferred by Plaintiffs onto Defendants is inequitable, as the Defendants accepted this valuable and appreciable benefit while simultaneously denying any possible return of value in the form of a share of the award proceeds.

236. Pretextually, Defendant Pratt determined that this information has no value, despite actual evidence showing the value of the information, and in contravention of the City's affirmative acknowledgment of the importance of Whistleblower information in general.

237. Further, the deprivation here is unjust, as Defendant Pratt has received valuable information, claims that he still has the right to use and act on it as he sees fit, while denying Plaintiffs any value in return.

238. Finally, the value due Plaintiffs by Defendants is can only be adequately determined through litigation of the underlying complaint; as the value of Plaintiffs loss cannot be determined, and the information cannot be returned to Plaintiffs, specific performance of the quasi-contract is required.

## JURY TRIAL

To the extent any questions of fact may arise that permit a jury to be empaneled, Plaintiffs hereby demand a jury trial on any issues so triable.

## RELIEF

**WHEREFORE**, Plaintiffs pray that this Court:

1. Enter a judgment against Defendants Marcel Pratt, in his official capacity as City Solicitor, and Defendant City of Philadelphia;

2. Enter a Declaratory Judgment declaring the FCO § 19-360 (2) (b) (.3) unconstitutional;

3. Enter a Declaratory Judgment declaring the FCO § 19-3603 (2) (c) unconstitutional as interpreted by the City Solicitor;

4. Enter a Declaratory Judgment declaring that Defendant Pratt violated Plaintiffs constitutional right to due process;

5. Order Injunctive Relief to enjoin Defendants from using FCO § 19-3603 (2) (b) (.3) and requiring Defendants to designate Plaintiffs to move forward with their proposed complaint on behalf of the City;

6. Award Compensatory Damages for any costs or fees necessary for Plaintiffs to amend or otherwise modify their action under the FCO to accommodate the Citys designation;

7. Award Costs and reasonable Attorneys Fees for this action pursuant to 42 U.S.C. § 1988

8. Order any other Relief this Court may deem just and proper.

Respectfully Submitted,

**Andrew B. Austin, Esq.**
Pennsylvania Bar # 323768
*Attorney for Plaintiffs*

STACKHOUSE GROUP
P.O. Box # 54628
Philadelphia, Pennsylvania, 19145
+1 (610) 656-1956
austin@stackhousegroup.com

44

## VERIFICATION OF ANDREW J. DANKANICH

I, Andrew J. Dankanich, hereby state that I am a Plaintiff in this action and declare as follows: I have reviewed this Complaint, and all statements and information contained within are true and correct to the best of my knowledge, information, and belief. Further, I understand that the statements in this Complaint are subject to the penalties of 28 U.S.C. § 1746 (relating to unsworn declarations under penalty of perjury).

Andrew J. Dankanich
Plaintiff

DATED: 3/26/19

## VERIFICATION OF NICHOLAS A. MARRANDINO

I, Nicholas A. Marrandino, hereby state that I am a Plaintiff in this action and declare as follows: I have reviewed this Complaint, and all statements and information contained within are true and correct to the best of my knowledge, information, and belief. Further, I understand that the statements in this Complaint are subject to the penalties of 28 U.S.C. § 1746 (relating to unsworn declarations under penalty of perjury).

**Nicholas A. Marrandino**
Plaintiff

DATED: March 26, 2019.

## VERIFICATION OF ANDREW B. AUSTIN, ESQ.

I, Andrew B. Austin, Esq.  hereby state that I am a Attorney for the Plaintiffs' in this action and declare as follows: I have reviewed this Complaint, and all statements and information contained within are true and correct to the best of my knowledge, information, and belief. Further, I understand that the statements in this Complaint are subject to the penalties of 28 U.S.C. § 1746 (relating to unsworn declarations under penalty of perjury).

**Andrew B. Austin, Esq.**
Pennsylvania Bar # 323768
*Attorney for Plaintiffs*

DATED: 3/26/19

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this **Plaintiffs' Amended Complaint** and any accompanying memorandum or other documents upon the Defendants or their Attorneys of Record via electronic case filing on **March 27, 2019**.

Respectfully Submitted,

**Andrew B. Austin, Esq.**
Pennsylvania Bar # 323768
*Attorney for Plaintiffs*

STACKHOUSE GROUP
P.O. Box # 54628
Philadelphia, Pennsylvania, 19145
+1 (610) 656-1956
austin@stackhousegroup.com