# EXHIBIT A

## Proposed Complaint for
## City of Philadelphia, et al. v.
## Conduent State & Local Services, et al.

### (Internal Exhibits Omitted)

Andrew Dankanich and
Nicholas Marrandino

vs.

Marcel Pratt, and
City of Philadelphia

Andrew B. Austin, Esq.
STACKHOUSE GROUP
P.O. Box #54628
Philadelphia, PA 19148                    *Attorney for Plaintiff-Relators*

| | |
|---|---|
| **CITY OF PHILADELPHIA**, c/o Law Department 1 Parkway Building, 17th Floor 1515 Arch Street Philadelphia, PA 19102, | |
| *ex. rel.* | |
| **ANDREW J. DANKANICH**, 3104 South 13th Street Philadelphia, PA 19148, | |
| and | |
| **NICHOLAS A. MARRANDINO** 2319 South Percy Street Philadelphia, PA 19148, | COURT OF COMMON PLEAS PHILADELPHIA COUNTY _ Term, 2018 No. ___ |
| Plaintiff-Relators; | |
| vs. | |
| **CONDUENT STATE & LOCAL SERVICES,** 12410 Milestone Center Drive, 5th Floor Germantown, Maryland, 20876, | COMMERCE COURT JURY TRIAL DEMANDED ASSESSMENT OF DAMAGES REQUIRED |
| **PHILADELPHIA PARKING AUTHORITY,** 701 Market Street, Suite 5400 Philadelphia, Pennsylvania, 19106, | |
| **VINCENT J. FENERTY, JR.** 475 Pinewood Road Philadelphia, PA 19116, | |
| and | |
| **JAMES F. HOCH,** 10954 Knights Road Philadelphia, PA 19154, | |
| Defendants. | |

| NOTICE | AVISO |
|---|---|
| You have been sued in court. If you wish to defend against the claims set forth in the following pages, you must take action within twenty (20) days after the complaint and notice are served, by entering a written appearance personally or by attorney and filing in writing with the court your defenses or objections to the claims set forth against you. You are warned that if you fail to do so the case may proceed without you and a judgment may be entered against you by the court without further notice for any money claimed in the complaint or for any other claim or relief requested by the plaintiff. You may lose money or property or other rights important to you.<br><br>YOU SHOULD TAKE THIS PAPER TO YOUR LAWYER AT ONCE. IF YOU DO NOT HAVE A LAWYER OR CANNOT AFFORD ONE, GO TO OR TELEPHONE THE OFFICE SET FORTH BELOW TO FIND OUT WHERE YOU CAN GET LEGAL HELP.<br><br>PHILADELPHIA BAR ASSOCIATION<br>Lawyer Referral and Information Service<br>1101 Market Street, 11th Floor<br>Philadelphia, Pennsylvania 19107<br>(215) 238-1701 | Le han demandado a usted en la corte. Si usted quiere defenderse de estas demandas expuestas en las páginas siguientes, usted tiene veinte (20) dias de plazo al partir de la fecha de la demanda y la notificación. Hace falta asentar una comparencia escrita o en persona o con un abogado y entregar a la corte en forma escrita sus defensas o sus objeciones a las demandas en contra de su persona. Sea avisado que si usted no se defiende, la corte tomará medidas y puede continuar la demanda en contra suya sin previo aviso o notificación. Además, la corte puede decidir a favor del demandante y requiere que usted cumpla con todas las provisiones de esta demanda. Usted puede perder dinero o sus propiedades u otros derechos importantes para usted.<br><br>LLEVE ESTA DEMANDA A UN ABOGADO INMEDIATAMENTE. SI NO TIENE ABOGADO O SI NO TIENE EL DINERO SUFICIENTE DE PAGAR TAL SERVICIO, VAYA EN PERSONA O LLAME POR TELEFONO A LA OFICINA CUYA DIRECCION SE ENCUENTRA ESCRITA ABAJO PARA AVERIGUAR DONDE SE PUEDE CONSEGUIR ASISTENCIA LEGAL.<br><br>ASOCIACIÓN DE LICENCIADOS DE FILADELFIA<br>Servicio De Referencia E Información Legal<br>1101 Market Street, 11th Floor<br>Filadelfia, Pennsylvania 19107<br>(215) 238-1701 |

# COMPLAINT – FALSE CLAIMS

## TABLE OF CONTENTS

Introduction .......................................................................................................... 4

Parties ................................................................................................................... 5

Other Persons/Entities ......................................................................................... 6

False Claims Allegations ....................................................................................... 7

    First Red Light Bid and Award Irregularities ................................................... 7

    Overview of Xerox's System ............................................................................ 11

    Failed to Capture Parallel Events ................................................................... 13

    Failed to Compensate for Speed Changes ..................................................... 14

    Overwhelmed by Bad Events .......................................................................... 14

    Whitewashed Technical Audit ........................................................................ 16

    Other Significant Problems ............................................................................ 17

    Initial Investigation and Set-Off Penalties ..................................................... 18

    Executive Director's Financial Audit ............................................................... 22

    Negotiations and Return of Penalties ............................................................ 24

    2017 Committee Meeting ............................................................................... 26

    Retaliatory Termination of Plaintiff-Relators ................................................. 28

    Renewal Award to Xerox/Conduent ............................................................... 33

Procedural Notes ................................................................................................ 34

Nexus of City Funds ........................................................................................... 35

Count #1 False Claims §§ 19-3600 *et seq.* Phila. vs. Conduent (Unpaid Penalties) ................ 37

Count #2 False Claims §§ 19-3600 *et seq.* Phila. vs. Conduent (Fraudulent Award)............... 39

Count #3 False Claims §§ 19-3600 *et seq.* Phila. vs. Conduent (Fraudulent Renewal) ........... 42

Count #4 False Claims §§ 19-3600 *et seq.* Phila. vs. James F. Hoch ......................... 45

Count #5 False Claims §§ 19-3600 *et seq.* Phila. vs. Vincent J. Fenerty, Jr................... 47

Count #6 Retaliation § 19-3604 Dankanich vs. All Defs................................... 50

Count #7 Retaliation § 19-3604 Marrandino vs. All Defs.................................. 51

# INTRODUCTION

Plaintiff-Relators Andrew J. Dankanich and Nicholas A. Marrandino through their attorney, Andrew B. Austin, bring this action on their own and on the behalf of the City of Philadelphia against Defendants Conduent State & Local Services, James F. Hoch, and Vincent J. Fenerty, Jr., for their false claims and retaliation in violation of the Philadelphia Code §§ 19-3600 (False Claims) *et seq*.

Defendant Conduent was awarded the contract for the Philadelphia Parking Authority's Red Light Camera system in 2014, which was renewed in 2017 for an additional five years. This contract was improperly awarded to Defendant Conduent due to the actions of Defendants Fenerty and Hoch, where they pre-selected Defendant Conduent (then known as Xerox) as the winning bidder well in advance of the bid evaluation and worked to ensure their award through use of inappropriate influence, violations of confidentiality, and other means.

Whereupon it was discovered that the pre-selected vendor, Defendant Conduent, could not adequately perform to the requirements of the contract--both technically and as a matter of system uptime—and was therefore subject to liquidated damages provisions, Defendants jointly worked together to minimize these penalties, before finally simply refunding all funds withheld at the request of Defendant Conduent. These funds were refunded despite ample evidence that Defendant's system was not performing and that the penalties were merited.

Finally, when the time came for the Red Light Camera contract to be placed to bid again, Defendants terminated the Relators--who had been attempting to enforce the terms of the agreement due to concerns of future interference—before awarding the contract renewal to Defendant Conduent, despite their now-proven inability to meet the terms of the contract for the past three years.

Over the interceding year, Plaintiff-Relators have made numerous efforts to bring these problems to the attention of the Federal, State, and City agencies and officials, as well as the general public, however there has been no actions taken as a result of these efforts. Therefore, Plaintiff-Relators present this Complaint for action under the Philadelphia Code § 19-3604 (2) (a) ("Civil Actions for False Claims").

# PARTIES

1.    Plaintiff City of Philadelphia is a municipal corporation of the First Class of the Commonwealth of Pennsylvania under the First Class City Home Rule Act of April 21, 1949, P.L. 665, § 1 *et seq.*

2.    Plaintiff-Relator Andrew J. Dankanich is an adult individual, residing at 3104 S 13th Street, Philadelphia, Pennsylvania, 19148, who previously was the "Manager of Red Light Camera" of the Philadelphia Parking Authority from January 22nd, 2013 until his termination on March 1st, 2017, and had been with the Parking Authority for 17 years having worked his way up from Parking Enforcement Officer.

3.    Plaintiff-Relator Nicholas A. Marrandino is an adult individual, residing at 928 Morris Street, Philadelphia, Pennsylvania, 19148, who previously was the "Quality Assurance Officer" for Philadelphia Parking Authority from late 2014 until his termination in July 9th, 2017.

4.    Defendant Conduent State & Local Services, Inc. is a New York corporation (NYDOS #157061), with its principal place of business at 12410 Milestone Center Drive, 5th Floor, Germantown, Maryland, 20876. Defendant Xerox/Conduent was previously known from 2012 to 2017 as "Xerox State & Local Solutions." References to the Defendant in this complaint use "Xerox", "Conduent", or "Xerox/Conduent" as may be appropriate for the time period.

5.    Philadelphia Parking Authority ("Parking Authority") is the Parking Authority for the City of Philadelphia under Title 53 Pa. C.S.A. § 5501 et seq, created by ordinance of the City on January 11th, 1950. The Parking Authority has extensive statutory and contractual relationships with the City of Philadelphia, including On-Street Operations and the Parking Operations at the Philadelphia International Airport. Since 2005, the Parking Authority is the state-authorized agency to provide Red Light Photo Enforcement within the City of Philadelphia, which was recently extended to also allow for Speed Cameras.

6.    Defendant Vincent J. Fenerty, Jr. is an adult individual, residing at 475 Pinewood Road, Philadelphia, Pennsylvania, 19116, who was 'Executive Director' of the Philadelphia Parking Authority during all times relevant hereto

until his resignation in September 2016. Thereafter, Defendant continued to wield significant influence over the Parking Authority despite his lack of continuing formal relationship with that organization.

7.  Defendant James F. Hoch is an adult individual, residing at 10954 Knights Road, Philadelphia, Pennsylvania, 19154, who is currently the 'Director of Support Services' and previously 'Director of Enforcement' of the Philadelphia Parking Authority. Relevant to this complaint, Defendant Hoch is and was the director to which the Red Light Camera department, and further was the designated "Project Manager" appointed by the Parking Authority to manage and oversee the Red Light Camera contract including having responsibility for all payments made to- and set-off penalties imposed upon- Defendant Xerox/Conduent.

## OTHER PERSONS/ENTITIES

8.  Corinne O'Conner is 'First Deputy Executive Director' at the Philadelphia Parking Authority, and Defendant Hoch's direct supervisor. Ms. O'Conner was directly involved in both Red Light Camera bid committees and further was a regular part of the working group between the Parking Authority and Defendant Conduent.

9.  Susan Cornell is and was an employee of the Philadelphia Parking Authority; due to promotions and other personnel changes, her title has changed several times, but she is currently 'Senior Director of Administration.' Relevant to this complaint, Ms. Cornell was involved in both 2014- and 2017- Red Light Committees and worked closely with Defendant Fenerty until his resignation.

10. Giorgio ("George") Fieo, is 'Internal Audit Manager', at the Philadelphia Parking Authority, who directly reported to Defendant Fenerty. Relevant to the complaint, Mr. Fieo is a Certified Public Accountant in the State of Pennsylvania and was known to be Defendant Fenerty's 'troubleshooter'.

11. Lisa Dougherty is and was 'Project Manager' at Defendant Xerox/Conduent for the time period beginning no later than the award of the initial 2014 Red Light Camera contract and continued to present. Ms. Dougherty is the first-level

manager for all Philadelphia Red Light Camera Operations and is designated by the contract as Jim Hoch's counterpart.

12.   James Lazarski is and was 'Regional Director' at Defendant Xerox/Conduent for the time period of the initial 2014 Request for Proposal to the present. Mr. Lazarski the director of all Red Light Camera programs for the East Coast of the United States and is Ms. Lisa Doughtery's direct supervisor.

13.   Thomas Nestel, III, was and is a Red Light Camera consultant under his company "Nestel Consulting" for the Parking Authority at all times relevant hereto. Mr. Nestel is a police officer and also Chief of the SEPTA Transit Police in Philadelphia.

## FALSE CLAIMS ALLEGATIONS

### *First Red Light Bid and Award Irregularities*

14.   In 2013, the Parking Authority formed an internal committee to prepare for and select a vendor for the Red Light Camera system that would be awarded in 2014 ("2014 Red Light Committee").

15.   The 2014 Red Light Committee was to be chaired by Defendant Hoch, and its membership included Ms. O'Conner, and Plaintiff-Relator Dankanich, among others. Notably, Defendant Fenerty was not part of the committee.

16.   The Philadelphia Parking Authority sought a vendor for the award of a new Red Light Camera system to replace their previous system, issuing a Request for Proposals on September 18th, 2013 ("2014 RFP") (Exhibit B).

17.   The Committee met several times prior to finalizing the 2014 RFP, relying heavily on Plaintiff-Relator Dankanich's experience as Manager of the Red Light Camera Department for guidance as to the technical aspects of the requirements.

18.   The Red Light Camera system RFP was for a "full-service program for red light traffic signal photo enforcement and associated services." (Exhibit B at #1).

19. Red Light Traffic Signal Photo Enforcement was to be accomplished by photographic means, with one camera "cover[ing] all lanes for each undivided approach," (Exhibit B at #B.11.5), and capable of "full motion video for each violation of a red signal, "(Exhibit B at #B.12.2), as well as capable of detecting and recording "straight through," "left-turn and right-turn violations" including for "slow-moving right-turn vehicles, at approaches with single and multiple lanes." (Exhibit B at #B.12.1).

20. Further, each camera was to be "capable of operating effectively in all weather conditions, including heat, cold, wet, and dry." (Exhibit B at #B.11.3).

21. Defendant Xerox/Conduent (operating at that time as Xerox) was one of three vendors that was considered by the Parking Authority, with the other two vendors being American Traffic Solutions ("ATS"), and Redflex Traffic Systems, Inc. ("Redflex").

22. After the RFP was released, Defendant Fenerty, despite not being on the committee, took unofficial control of the Committee from Defendant Hoch and attended all meetings while acting as the *de facto* Chair.

23. During this time, it became evident to Committee members, including both Defendant Hoch and Plaintiff-Relator Dankanich, that Defendant Fenerty was not acting impartially, and favoring Defendant Xerox/Conduent.

24. During the bid process, the 2014 Red Light Committee arranged to conduct site visits of the vendors, including both ATS and Redflex in Arizona, and Defendant Xerox/Conduent in Maryland.

25. Defendant Fenerty's preference for Defendant Xerox/Conduent was so obvious that Defendant Hoch refused to accompany the committee to Arizona to visit ATS and Redflex, telling Plaintiff-Relator Dankanich that "it was a waste of time" and that Hoch "already knew who was getting the contract."

26. Instead, Defendant Fenerty arranged for himself and other committee members, including Plaintiff-Relator Dankanich and Ms. O'Conner to travel to Arizona for ATS and Redflex.

27.   During this trip, Defendant Fenerty advised Plaintiff-Relator Dankanich to "ask as many questions as you can" to the vendors and "try to trip them up." While he was uncomfortable with the partisan nature of the order, Dankanich had intended to ask *all* vendors numerous questions to try to get the best system possible for the Parking Authority (particularly as he would be one of the front-line users for the system).

28.   However, one of the questions raised by Plaintiff-Relator Dankanich with the vendors was regarding the amount of time between "capture" (when the camera detected the event/violation) and "transmission" (when the Parking Authority would receive the event/violation). In response to this question, Redflex advised they could provide the event to the Parking Authority in "under 5 hours" which surprised Defendant Fenerty and the committee members, as this was an exceptionally short time.

29.   At the first opportunity after leaving the vendor, Defendant Fenerty called (on speaker) Defendant Xerox/Conduent's representative. Fenerty advised Xerox of Redflex's capture-transmission time and told Xerox that they needed to have a competitive time.

30.   Later, the committee members and Defendant Fenerty arranged to visit Defendant Xerox/Conduent in Maryland, and this time were accompanied by Defendant Hoch as well as a Parking Authority Consultant, Mr. Nestel.

31.   During this trip, Defendant Fenerty pulled Plaintiff-Relator Dankanich aside, and instructed him **not** to "ask any questions [of Defendant Xerox/Conduent]." Despite this, Dankanich continued asking questions–both appropriate for the committee to consider and similar to those he had asked the other vendors– and Defendant Fenerty again pulled him aside and told him to "shut up" in a threatening manner.

32.   As the bid process continued, Defendant Fenerty's partiality to Defendant Xerox/Conduent became more apparent, as Fenerty was providing them confidential information right up until the bid was awarded, including at the final bid presentations.

33.  Notably, Defendant Xerox/Conduent's initial proposal was not the lowest bid, however after the sealed bids were opened Defendant Fenerty permitted Xerox to "revise" their bid, which then–unsurprisingly–became the lowest.

34.  At the final bid presentations, each vendor came before the Committee to present their bids and answer any additional questions by the committee members. Defendant Fenerty again chaired this meeting, having now completely taken over the committee, which was attended by members including Defendant Hoch, Ms. O'Conner, Ms. Cornell, Plaintiff-Relator Hoch, and Mr. Nestel.

35.  Prior to the lunch break during Defendant Xerox/Conduent's day of presentations, the 2014 Red Light Committee (including Defendant Fenerty) met in closed session to discuss the morning, at which point Mr. Nestel observed that Xerox was not approved for the use of radar in Pennsylvania, which would disqualify them as a vendor for the contract.

36.  At this information, Defendant Fenerty became very animated, and insisted that Defendant Xerox/Conduent had until the end of the day to present the necessary approval.

37.  Immediately after lunch, Defendant Xerox/Conduent's salesperson, Ms. Karen Byer, passed out their certification which had been granted while the committee was at lunch, and advised that "Sue [Cornell] texted her over lunch, and told her she needed to get this before the end of the day." Upon information and belief, Ms. Cornell texted Xerox at the behest of Defendant Fenerty.

38.  After the presentations, the committee members had a closed session to discuss the bids, then individually scored them under the evaluation terms of the 2014 RFP.

39.  Each member of the committee then gave their evaluation score-sheet to Defendant Fenerty, who personally reviewed them and determined who won the award. At no point was any committee member permitted to review the individual evaluations, with the results known only to Fenerty.

40.   While the Committee Members had previously discussed and come to a consensus that the Xerox's system was inferior in a number of significant and material evaluation criteria, Defendant Fenerty revealed that Defendant Xerox/Conduent had won the award.

41.   Interestingly, after the bid was awarded, one of the competing vendors, ATS, protested the award with the Parking Authority and requested a stay of procurement. Defendant Fenerty—as head of the procuring agency—had discretion to deny and did deny both the protest and stay as meritless and untimely. *See American Traffic Solutions, Inc. v. Philadelphia Parking Authority,* 2014 WL 2447308 (Pa. Commw. Ct. 2014).

42.   Further, ATS appealed Defendant Fenerty's decision to the Commonwealth Court, where neither the Fenerty nor the Parking Authority disclosed these conflicts of interest. As a result of these deliberate omissions on the part of Defendant Fenerty, the Court upheld Fenerty's discretionary denial. *See Id.*

### *Overview of Xerox's System*

43.   Defendant Xerox/Conduent's Red Light Camera system utilized a radar system connected to video-capable cameras to identify and capture violations.

44.   Each approach (or side) of an intersection have a single radar system and camera and was connected to the traffic control device ("red light") in a read-only fashion, to determine the state of the light.

45.   When the system determined that the light was red, the radar would identify vehicles (using their speed and relative location to the radar) and calculate a timing pattern for the cameras to capture a still frame.

46.   The timing pattern calculated the speed of the vehicle to determine when it would be at (meaning just before) the stop bar painted on the intersection, which would be captured as 'Frame A'. A second capture was calculated to show the vehicle violating the intersection as a 'Frame B'.

47.   These two frames and their associated data (e.g. time, place) were correlated as an 'Event' which would be added to the Xerox database, and Xerox would

make a third image by cropping a photograph to clearly show the license plate.

48.   Initially the video was not a mandatory part of the event, however due to the multitude of problems experienced, later became an integral part of each event to allow review and verification.

49.   Each event was reviewed by the Parking Authority no less than 3 times assuming there were no problems, before being sent to a Philadelphia Police Officer for review and ticket approved.

50.   Initially, Defendant Xerox/Conduent's responsibilities for event review were limited only to cropping the picture, however due to the defects in the system this imposed a high overhead on the Parking Authority, and eventually Xerox would review each event and place it into a good or appropriate reject queue.

51.   However, even if Defendant Xerox/Conduent placed the event into a reject queue, the Parking Authority staff still needed to review the events, both due to human error by Xerox employees or because they were miscategorized.

52.   After the ticket was approved by Philadelphia Police, the event would go back to Defendant Xerox/Conduent as a violation, who were also responsible for the issuance (by mail) and collection of the ticket

53.   Defendant Xerox/Conduent had made a number of representations to the Parking Authority in their bid and during their bid process regarding their proposed system, as other vendors had raised concerned with the Parking Authority about Xerox's over-reliance on radar.

54.   To address the Parking Authority's stated concerns, Defendant Xerox/Conduent made a number of false representations regarding the efficacy of their system, including:

   A.   the radar system would be capable of capturing multiple parallel events,

   B.   the radar system would accurately calculate and capture more than 80% good events, and

   C.   their system would not take images of non-vehicles.

55. Defendant Xerox/Conduent immediately had numerous issues from the start of the contract, many of which were attributed by the Parking Authority to normal issues related to the implementation of a new system with a change in technology.

56. However, by late 2014, it became apparent to both Plaintiff-Relators Dankanich and Marrandino that the system was having more than normal 'teething' issues, but instead the technology promised by Xerox simply could not function in the manner promised.

## Failed to Capture Parallel Events

57. The Red Light System was intended and required to offer a system that was capable of capturing multiple lanes of traffic with multiple simultaneous violators in parallel (e.g. in adjacent lanes crossing at the same time.)

58. Defendant's Xerox system—even functioning at its optimum—would capture only one violator when multiple violations occurred in parallel, and in the event of consecutive violations would only capture one lane of violators, due to limitations of their radar system.

59. As a result, Defendant Xerox/Conduent's technology was incapable of effectively capturing the most common type of red-light violation in Philadelphia, where multiple lanes of traffic would all run the red light in the seconds immediately after the light's change.

60. To address this issue, the Parking Authority recommended to Defendant Xerox/Conduent that they implement one radar per lane (instead of one per approach), believing this to be the only effective solution to fix the multiple parallel event problem.

61. Ultimately, Defendant Xerox/Conduent's refused to implement this solution, and continued attempting other fixes, but their radar systems did not ever effectively capture multiple parallel events.

## *Failed to Compensate for Speed Changes*

62.   Defendant Xerox/Conduent's camera was determined to have another major flaw as in enforcing a red light violation where the violator increased their speed immediately prior to violating the intersection.

63.   Defendant Xerox/Conduent's radar would calculate the timing of the two photographs based upon the speed the violator was travelling at the time the system determined it would violate; however, the system seemed incapable of compensating for a change in the vehicle's speed, which was common when drivers would attempt to speed up to get across the intersection.

64.   When vehicles increased speed, Defendant Xerox/Conduent's system took the resulting Frame A photographs too late for a ticket to be issued, as the vehicle was not photographed before the stop-bar.

65.   In fact, Defendant Xerox/Conduent's system could also not address the *desired behavior* by driver's, where they dramatically *decreased* speed so that they would stop instead of running the red light, and the system would generate a 'bad event' that showed the vehicle not committing a violation.

## *Overwhelmed by Bad Events*

66.   While Defendant Xerox/Conduent's technology struggled to capture actual violations of red light, a major problem with the technology was that it captured an inordinate number of events that were not violations–including non-violations where the vehicle stopped in response to the red light, but also pedestrians in wheelchairs, bicyclist, triggering multiple times for a single vehicle, or photographs too dark to see anything.

67.   The Parking Authority primarily attributed these problems to Defendant Xerox/Conduent's preference to use a single radar sensor instead of multiple radars or complementary sensor types.

68.   During the bid process, this was one of the concerns that a competing vendor had raised regarding Defendant Xerox/Conduent's technology during the bid

process, where they advised that a radar sensor wasn't going to be able to perform to the specification, and that an under-road sensor or other technology would be needed.

69.     Defendant Xerox/Conduent claimed that their radars simply required additional 'tuning' for each approach, claiming that each approach of each site brought individual challenges that required Xerox to make minor changes in both the firmware programming and minor physical changes at the site.

70.     In fact, a few of the Red Light Camera sites worked extremely well, but these sites were the exception among the 131 cameras that Defendant Xerox/Conduent had built and maintained. These 'good' sites were raised as positive examples, but Xerox could not explain why they were unable to replicate that experience system-wide.

71.     The Parking Authority suspected that Defendant Xerox/Conduent did not improve their system simply because it was economically too expensive, as 'tuning' each site required a significant investment of man-hours. Instead, Xerox preferred to try to implement system-wide changes that would be cheaper but proved ineffective.

72.     Events that did not result in a violation were considered "bad events," which would be categorized as 'controllable' (event should not have been created by the system) or 'uncontrollable' (event was unavoidable.) Uncontrollable events included events like emergency vehicles, funeral processions, street work. Controllable events included things like 'dark shots' (where the picture was too dark to issue an event), 'Frame A' (vehicle was not pictured before the stop bar), 'Radar Effect' (the radar erroneously triggered), or a pedestrian wheelchair crossing, among many other reasons.

73.     The number of events that the system created that were not good violations was a major concern to the Parking Authority, as every event created by the system was reviewed by a Parking Authority employee.

74.     To determine the system effectiveness, Plaintiff-Relator Dankanich frequently evaluated the system 'yield' on both a per-site and system-wide basis, which was calculated by the number of violations issued divided by the number of events that Xerox created.

75.     Defendant Xerox/Conduent had promised a 40% or better yield, which was comparable to the performance of the previous Red Light vendor.

76.     However, Defendant Xerox/Conduent's monthly yield was infrequently greater than 20%, and for some sites was less than 1%, with the majority of the bad events being due to controllable factors.

77.     Due to Defendant Xerox/Conduent's inability to meet the promised and expected yield, the Parking Authority incurred significant overtime costs, which continued through January of 2017.

### Whitewashed Technical Audit

78.     In 2015, the Defendant Xerox/Conduent and the Parking Authority arranged to audit the performance of the red light cameras. The Parking Authority selected a number of Red Light Camera sites to audit, primarily along the Roosevelt Boulevard, and arranged for Mr. Nestel to perform the testing.

79.     The audit was to be conducted by running four vehicles against the red light under varying conditions, including all four vehicles simultaneously, and at varying speeds. These test conditions would then be compared both to events generated by Defendant Xerox/Conduent's system, as well as the number of good violations that would be captured.

80.     In preparation for the audit, Defendant Xerox/Conduent brought in a special technician, who along with the regular crews performed extensive maintenance and tuning of the selected audit sites.

81.     On the test day, Mr. Nestel suggested that they should also perform testing on some of the other Red Light Cameras that had not been subject to Defendant Xerox/Conduent's special treatment, however Xerox immediately protested that the Parking Authority could not audit sites that they had not been on the list provided by Defendant Fenerty.

82.     The audit was performed as scheduled and only on the listed sites; however, despite Defendant Xerox/Conduent's foreknowledge and preparation for the testing, the events were withheld from the Parking Authority's system for

several days, which was believed to be due to manual manipulation of the test results.

83.   When the data was finally provided by, Defendant Xerox/Conduent to the Parking Authority, they claimed the results proved that their system was working well, however even these results were not the promised 40% yield– even after Xerox's extensive preparations.

84.   Unbeknownst to Defendant Xerox, the Parking Authority had contracted for a second independent audit to be conducted the following week by Mr. Nestel.

85.   Mr. Nestel conducted the second audit under similar conditions to the first audit, including a number of the same sites, however Mr. Nestel's results were dramatically different than Defendant Xerox/Conduent's, and upon information and belief to have a capture rate of less than 10%.

86.   Plaintiff-Relators Dankanich and Marrandino were not surprised–and in fact expected–these disparate results, as they supported the Parking Authority's claims that the system had not been operating correctly from the beginning.

87.   The report was provided to Parking Authority stakeholders, including at least Defendant Hoch, Ms. O'Conner, and Plaintiff-Relators Dankanich and Marrandino, but upon information and belief, no further action was taken as a result of the independent technical audit. No further official discussion was made regarding the results, nor did the Parking Authority ask for any explanation from Defendant Xerox/Conduent.

## *Other Significant Problems*

88.   Further, Defendant Xerox/Conduent was not only having problems technically, but there were a number of other material problems in their operation of the contract, mainly due to Xerox's unwillingness to adequately fund their operations to meet the terms of the contract.

89.   Both Defendant Xerox/Conduent and the Parking Authority were overwhelmed by the number of bad events. While the majority of the problem was technical–the system created too many events–the Parking Authority

could not even review events until after Defendant Xerox initially processed them.

90. Due to the multitude of events, Defendant Xerox/Conduent routinely had several days' worth of pending events to process that had not been yet submitted to the Parking Authority–and at times this could back up to a week's delay.

91. While Defendant Xerox/Conduent was required to "assign an adequate quantity of employees" to meet the terms of the contract, (Exhibit A at #10.10), Xerox had seemingly for this initial process performed by local staff who had other primary duties (e.g. customer service center, payment processing).

92. The Statute of Limitations for these violations was 90 days, therefore any avoidable delay by Xerox could result in significant impacts to the revenues of the Red Light Camera system.

93. Since Defendant Xerox/Conduent's local staff could not keep up, they began to outsource a great deal of work to a Xerox facility in Ciudad Juarez, Mexico, which was a direct violation of a contract term requiring all work be performed at "prevailing wages for the industry and trade." (Exhibit B at #20).

94. However, after this was brought to Defendant Xerox/Conduent's attention, they ceased using the cheaper foreign labor, but failed to adequately replace it with prevailing wage labor, resulting in increasing ticketing times and lost revenue due to the statute of limitations.

## Initial Investigation and Set-Off Penalties

95. In December 2014, Plaintiff-Relator Marrandino began to look into the Red Light Camera program's downtime, as he noticed that the Parking Authority was being billed for a camera site on Gray's Ferry Avenue that had failed days after coming online and had never worked since.

96. Plaintiff-Relator Marrandino began with a review of the Red Light Camera system using Defendant Xerox/Conduent's internal computer systems, where

he found numerous sites with downtime issues that the Parking Authority was still paying for as if they were functioning correctly.

97. Plaintiff-Relator Marrandino brought these issues to the attention of his direct supervisor, Defendant Hoch, asking him if the "Parking Authority was supposed to be paying for cameras that weren't working".

98. Defendant Hoch stated that he didn't know anything about that, and it wasn't his responsibility, but Plaintiff-Relator Dankanich's and directed Plaintiff-Relator Marrandino to speak with him.

99. Thereafter, Plaintiff-Relators Marrandino and Dankanich spoke regarding the outages and downtime and Defendant Hoch's claim that "knew nothing about it."

100. Plaintiff-Relator Dankanich advised Plaintiff-Relator Marrandino that Defendant Hoch might not have known about any specific site being down, he was very much aware of the numerous issues, as Dankanich regularly told him of them.

101. However, Plaintiff-Relator Dankanich had taken no action due to Defendant Fenerty's direct order: "Hands off, do nothing about the [expletive] Xerox contract," and to "leave [Defendant Xerox] alone."

102. Plaintiff-Relators Marrandino and Dankanich agreed this was wrong, and Marrandino raised the issue again with Defendant Hoch, this time specifically raising the issue that Hoch was "responsible" for these bills, as he was the one signing them, and Hoch instructed Plaintiff-Relator Marrandino to bring it up with Ms. O'Conner (as Hoch's supervisor).

103. Ms. O'Conner was advised of the earlier conversations with Defendant Hoch and Plaintiff-Relator Dankanich regarding Defendant Fenerty's instructions to Dankanich. In response, Ms. O'Conner stated: "That's [expletive] Vince," and told Plaintiff-Relator Marrandino that the Parking Authority had to "charge them something."

104. Ms. O'Conner advised Plaintiff-Relator Marrandino that Defendant Xerox/Conduent had a 24-hour grace period, and also (erroneously) that the

penalty per camera was $127/day. Ms. O'Conner then directed Marrandino to "work up a figure."

105.  Upon information and belief, Ms. O'Conner at the time calculated the penalty rate by dividing the monthly rate of $3,825.00 per approach by 30 days, which resulted in the $127/day figure.

106.  Plaintiff-Relator Marrandino advised Defendant Hoch of Ms. O'Conner's instructions, and that he would be reviewing all of the other cameras, as there were multiple issues and outages.

107.  After Plaintiff-Relator Marrandino completed his review, he presented his findings, including numbers of hours and the set-off amount (erroneously calculated at the $127/day rate) to Plaintiff-Relator Dankanich.

108.  Plaintiff-Relator Marrandino's initial set-off findings covered the period between contract start and December '14 and were approximately $83,000.

109.  Following the standard procedure for the Red Light billing, Plaintiff-Relator Dankanich subsequently submitted those findings, including the proposed set-off to Defendant Hoch.

110.  Each month subsequent, Plaintiff-Relator Marrandino would follow the same procedure:

   A.   review the camera systems through multiple means for system downtime,

   B.   compile a list of sites experiencing downtime including the total amount of downtime,

   C.   reduce the downtime hours by the 24-hour grace period,

   D.   multiply the downtime hours by the set-off amount,

   E.   submit both his findings and totals to Plaintiff-Relator Dankanich to review, and

   F.   Plaintiff-Relator Dankanich did not review Marrandino's findings, do to his orders from Defendant Fenerty,

111. Thereafter, Plaintiff-Relator Dankanich would review Plaintiff-Relator Marrandino's findings, discuss them if necessary, before submitting them to Defendant Hoch.

112. Defendant Hoch would then review the set-offs, with authority and responsibility for final approval on the bill and would then submit it to the Finance Department for payment.

113. Relator Marrandino was still frequently interfacing directly with Defendant Xerox/Conduent's staff during build-outs of new sites, and was under regular pressure by the Xerox management, despite advising the Xerox representatives that he had no authority to give back the money.

114. Mr. Jim Lazarski, Defendant Xerox/Conduent's Regional Director, was particularly insistent that Plaintiff-Relator needed to stop withholding the payments, and told Marrandino: "Nick, you gotta give us back our money."

115. Finally, Plaintiff-Relator Marrandino went to Defendant Hoch and told him about the problems he was having on sites with Defendant Xerox/Conduent, and that he could not keep working with them if they didn't stop harassing him about the penalties.

116. Upon information and belief, Defendant Hoch thereafter directed Defendant Xerox/Conduent to stop talking to Plaintiff-Relator Marrandino on-site about the issues, which did then stop.

117. However, Defendant Xerox/Conduent was still protesting the set-off amounts, and sometime in mid-2015, Plaintiff-Relator Marrandino and Ms. Dougherty met at the direction of Defendant Hoch and Ms. O'Conner to discuss the penalties.

118. At an initial meeting between Plaintiff-Relator Marrandino and Defendant Xerox/Conduent, Ms. Dougherty stated the position that they could not be penalized for issues out of the control of the vendor and claimed that they were not obligated for those issues.

119.   Plaintiff-Relator Marrandino had not, to this point, been given a copy of the contract, and after the initial meeting he requested and was provided one by Ms. O'Conner.

120.   Upon review of the contract, Plaintiff-Relator Marrandino was surprised to find that the penalty for downtime was not $127/day as he had been told, but actually $75.00 per hour, and further that the cameras were required to work "optimally to the satisfaction of the [Parking] Authority."

121.   Thereafter, Plaintiff-Relator Marrandino raised this new information both with his superiors and with Defendant Xerox/Conduent through Ms. Dougherty, who upon information and belief, escalated those issues internally with Defendant Xerox.

122.   After finding out the penalty rate under the contract, Plaintiff-Relator Marrandino reviewed his earlier information and corrected his figures, and thereafter calculated his downtime findings at the correct $75/hour set-off rate, coming to an estimate of $2.39 million dollars for the downtime from the beginning of the contract until June '15.

123.   However, Ms. Dougherty of Defendant Xerox/Conduent disagreed with Plaintiff-Relator's figures, and after extensive discussion Dougherty agreed Xerox owed at least $1.7 million to the Parking Authority.

### *Executive Director's Financial Audit*

124.   Upon information and belief, Defendant Xerox/Conduent privately and repeatedly complained to Defendant Fenerty regarding Plaintiff-Relators Dankanich and Marrandino's problems with Xerox, and particularly the amounts now being withheld.

125.   However, in the face of this new penalty figure, Defendant Fenerty brought in his 'Internal Audit Manager,' Mr. Fieo, to review the problem.

126.   Mr. Fieo worked was a Certified Public Accountant, working directly for Defendant Fenerty during the majority of his tenure as his 'troubleshooter', and

frequently was utilized to fix problems with individual departments in the Parking Authority.

127. In summer of 2015, Defendant Fenerty directed Mr. Fieo to investigate the contract for system performance, and any financial penalties that may be appropriate, and directed Plaintiff-Relator Marrandino to assist him as needed.

128. Thereafter, Mr. Fieo, in cooperation with Defendant Hoch, and Plaintiff-Relator Marrandino, investigated, developed an analysis of and audited the performance of the Xerox Red Light Camera system, which included accounting for downtime penalties and overall system performance.

129. Mr. Fieo concluded that by all metrics he used, Xerox's contractual performance was "very poor" and he found that the contract was not being rigorously enforced, and that damages in addition to the downtime found by Plaintiff-Relator Marrandino were owed (e.g. delay damages, cameras not working "optimally to the satisfaction of the [Parking] Authority.")

130. In Fall '15, after several months of investigation and review Mr. Fieo came to a figure of approximately $25 million in penalties owed (to date) by Defendant Xerox/Conduent to the Parking Authority.

131. Upon information and belief, Defendant Fenerty and Mr. Fieo met several times during the audit process to discuss drafts of the audit, including the set-off penalties.

132. However, after several drafts were presented to Defendant Fenerty, Plaintiff-Relator Marrandino was called to the Fenerty's office with Mr. Fieo. Fenerty, apparently believing that Marrandino had not known the results of Fieo's audits, and stated: "Can you [expletive] believe this? It's worth more than the contract!" Marrandino replied that he did believe it and that he felt Fieo's numbers were accurate.

133. Mr. Fieo, after some discussion with Defendant Fenerty and Plaintiff-Relator Marrandino where Fenerty was questioning Fieo's figures, said: "Just go with Nick's numbers", and that "[Marrandino's] numbers were probably more accurate" despite the fact that Marrandino had no formal training in bookkeeping or accounting.

*Negotiations and Return of Penalties*

134.  Plaintiff-Relator Marrandino thereafter returned to performing his work as before, where using the same method he would calculate the monthly penalties and submit them.

135.  However, the following year, Plaintiff-Relator Marrandino was against called before Defendant Fenerty. Fenerty stated: "[he was] tired of hearing about Xerox" and instructed Plaintiff-Relator Marrandino to "work it out" with Defendant Xerox/Conduent, and made it clear to Marrandino to "just make everyone happy."

136.  Plaintiff-Relator Marrandino was then directed to meet again with Ms. Dougherty of Defendant Xerox/Conduent and negotiating using his own earlier estimates of the set-off penalties.

137.  Notably, Marrandino was not provided with a copy of Mr. Fieo's report or methodology to assist him in these negotiations, nor was he told how to work it out by Defendant Fenerty. However, after brief discussion understood that any set-off that Xerox was unwilling to make would be conceded by the Parking Authority

138.  Thereafter, Plaintiff-Relator Marrandino and Ms. Dougherty had several discussions and meetings regarding the proposed penalties. Dougherty restated Defendant Xerox/Conduent's earlier position that they could not be penalized for any events that were not directly attributable to Xerox.

139.  Plaintiff-Relator Marrandino negotiated the Parking Authority's position to the best of his ability, despite believing that many of the concessions he was forced to make were not appropriate, but also that neither Defendant Fenerty nor the Parking Authority were willing to back him up on any contested issues.

140.  As a result, Plaintiff-Relator Marrandino and Ms. Dougherty were able to negotiate a reduced figure totaling only $1.39 million dollars (from the start of the contract until Fall '16).

141.  This figure was agreed to by Ms. Dougherty, representing Defendant Xerox/Conduent, and was presented to Defendant Fenerty, who ordered

payment for the difference between the new reduced figure and now excess amounts withheld.

142.   After the money was refunded, Plaintiff-Relator Marrandino was directly contacted by Mr. Lazarski from Defendant Xerox/Conduent, who was upset that any money was withheld, stating that "[Xerox] expected to get their money back", and that "Lisa [Dougherty] did not have authority to negotiate [any penalty amount]." Marrandino directed Lazarski to speak to Defendant Fenerty.

143.   Shortly thereafter, the Parking Authority and Defendant Xerox/Conduent arranged a meeting, attended by Defendant Fenerty, Defendant Hoch, Ms. O'Conner, and Plaintiff-Relators Dankanich and Marrandino from the Parking Authority, and included Ms. Dougherty and an unidentified senior vice president from Xerox.

144.   Plaintiff-Relator Marrandino and Dankanich both felt that the purposes of the meeting were disingenuous and that it was a 'dog and pony' show that was being put on for the benefit of Defendants Fenerty and Xerox/Conduent.

145.   However, after a brief discussion of the problems that had precipitated this meeting, Defendant Xerox/Conduent's vice president claimed that they had no knowledge of any of these problems.

146.   Plaintiff-Relator Dankanich and Plaintiff-Relator Marrandino, being the two persons most intimately involved with the failings of Defendant Xerox/Conduent's Red Light Camera system, educated their vice president in exquisite detail the numerous problems they had been having over the preceding two-plus years.

147.   The meeting was adjourned by Defendant Fenerty without resolution, but jointly another meeting was suggested in two weeks to give Defendant Xerox/Conduent time to review and investigate the problems.

148.   Two weeks later, another meeting was held, however only Defendant Fenerty, Ms. O'Conner, and Defendant Xerox/Conduent's vice president were invited and permitted to attended.

149. Immediately after the meeting, Ms. O'Conner came to speak with Defendant Hoch and Plaintiff-Relator Marrandino, stating about Defendant Fenerty: "You know what that [expletive] did upstairs? He gave all the money back [to Defendant Xerox/Conduent]!"

150. Plaintiff-Relator Marrandino asked Ms. O'Conner and Defendant Hoch what he was supposed to do, and he was directed "not to do anything" by Ms. O'Conner, as Defendant Fenerty was not going to consider further penalties against Defendant Xerox/Conduent.

### *2017 Committee Meeting*

151. Several months later, the Parking Authority formed a new committee to prepare a new bid for the Red Light Camera system which was to start in September 2017 ("2017 Red Light Committee").

152. The 2017 Red Light Committee was chaired by Defendant Hoch, and its membership again included Ms. O'Conner, Ms. Cornell, and Plaintiff-Relators Dankanich and Marrandino as well as two new members, Steven Boc, a Parking Authority attorney, and Judy Holland, a senior red light employee.

153. Defendant Fenerty had resigned from the Parking Authority in September '16 and was not officially involved with the committee. At the time, Plaintiff-Relators Dankanich and Marrandino believed that this meant that the new renewal process would be free of inappropriate influence, and they were free to offer an honest critique of Defendant Xerox/Conduent.

154. During the first meeting of the 2017 Red Light Committee, the members had a discussion of the problems with Defendant Xerox/Conduent's system particularly in relation to how to prevent these continuing and ongoing issues under the new RFP.

155. During this meeting, Plaintiff-Relator Dankanich communicated the major failings of Defendant Xerox/Conduent's system, including:

A.    that Xerox had never significantly improved its system as promised, and that the majority of technical failings that were present at the system implementation had not been resolved;

B.    that Xerox's cameras were technically incapable of capturing multiple parallel events, despite that being requirement of the contract;

C.    that Xerox had never been able to adequately address camera downtime, and that throughout the system there were cameras that never worked correctly;

D.    that Xerox had promised revenue increases of "up to four times," but despite increasing the number of cameras the total revenue had been flat;

E.    that Xerox still did not deliverer the promised or expected event-violation conversion performance of 40%, which required the Parking Authority to expend much greater resources than expected to investigate Red Light tickets, including excessive amounts of overtime for the majority of the contract;

F.    that Xerox had been caught in breach of contract several times, including attempting to collect on tickets during the legally required notice period, outsourcing to Mexico; and

G.    that Xerox was not trustworthy, as not only had they been found to be cheating during their performance audits, it was believed that instead of improving their system's performance that they had merely altered the system to have a higher event threshold—reducing the number of events at the expense of revenue violation.

156.   Other members of the 2017 Red Light Committee similarly had negative comments regarding Defendant Xerox/Conduent, including Ms. O'Conner and Plaintiff-Relator Marrandino.

157.   At the conclusion of the meeting, Defendant Hoch stated to the committee that they shouldn't worry, and that "Xerox would not be considered for the contract" as they had failed to adequately perform under the current contract.

158.   Plaintiff-Relator Marrandino also spoke privately with Defendant Hoch regarding the 2017 Request for Proposals, where they discussed that

Plaintiff-Relator Dankanich was right in his criticisms of the contract, and that Defendant Fenerty had refused to set-off the penalties in the contract.

159.   Defendant Hoch told Plaintiff-Relator Marrandino: "Don't worry about it," assured him that things were different now that Defendant Fenerty was gone, and further that "[Xerox/Conduent] would never be considered for this contract."

### *Retaliatory Termination of Plaintiff-Relators*

160.   However, Defendant Fenerty continued to exert undue influence over the Parking Authority, despite his resignation, as many individuals—including Defendant Hoch—owed their position to him.

161.   Defendant Fenerty had significant influence over individuals within the Parking Authority due to his position as a Republican Ward Leader in Philadelphia, as the Parking Authority was a Republican-controlled organization, and many of the employees had been hired or promoted due to Fenerty's patronage.

162.   Defendant Fenerty had been concerned since the 2014 bid regarding Plaintiff-Relator Dankanich's potential interference in Defendant Xerox/Conduent's contract due to his uncompromising attitude and reputation as a 'straight-shooter'.

163.   In 2013, prior to being promoted to the position of Quality Assurance Officer, Plaintiff-Relator Marrandino had been subjected to a two-hour long meeting with Defendant Fenerty where he had been questioned at length regarding any friendship or loyalties he might have with Plaintiff-Relator Dankanich.

164.   During this meeting, Defendant Fenerty made it clear to Plaintiff-Relator Marrandino that one of his job responsibilities was to work with Defendant Hoch to monitor and control Plaintiff-Relator Dankanich.

165.   Upon information and belief, Plaintiff-Relator Dankanich was not simply terminated by Defendant Fenerty due to Dankanich's association with another Republican Ward Leader, as well as a concern that he might attempt to go to the authorities.

166.    However, Defendant Fenerty had a long history with Plaintiff-Relator
        Marrandino and believed that Marrandino—as another Republican Ward
        Leader at the time—would 'toe the line.'

167.    Plaintiff-Relator Marrandino made it clear to Defendant Fenerty, and later
        Defendant Hoch, that he would do his job, and if Plaintiff-Relator Dankanich
        deserved to get fired then he would.

168.    Defendant Hoch and Plaintiff-Relator Marrandino subsequently had meetings
        where Hoch discussed removing Plaintiff-Relator Dankanich, particularly with
        regard to his constant problems with Defendant Xerox.

169.    However, during these meetings, Plaintiff-Relator Marrandino would find
        himself either defending Plaintiff-Relator Dankanich or more commonly staying
        silent, as it was apparent to Marrandino that Hoch was concerned about
        Dankanich.

170.    In December of 2016, Plaintiff-Relator Marrandino attended a Christmas
        gathering hosted by Defendant Fenerty, during which Fenerty told
        Marrandino: "The only thing you have left to do [at the Parking Authority] is
        have Dank terminated."

171.    Defendant Fenerty and Plaintiff-Relator Marrandino briefly argued, but Fenerty
        refused to more specific as to why Plaintiff-Relator Dankanich needed to be
        fired, only that Fenerty believed it was Marrandino's job to get him fired.

172.    Plaintiff-Relator Marrandino finally refused, stating that Defendant Fenerty
        could have fired Plaintiff-Relator Dankanich at any time while he was Executive
        Director, hadn't done so, and that Marrandino didn't think Dankanich deserved
        to be fired.

173.    Plaintiff-Relator Marrandino believed that this was related to Plaintiff-Relator
        Dankanich's potential interference with the upcoming Red Light Camera bid,
        particularly to the near proximity of time between the earlier committee
        meeting and Defendant Fenerty's instructions.

174. Following that meeting, Defendant Fenerty was also in frequent contact with Defendant Hoch, as Plaintiff-Relator Marrandino would frequently hear about these conversations from Hoch during their discussion.

175. Similarly, Defendant Hoch had increased his efforts to remove Plaintiff-Relator Dankanich, primarily by regularly meeting with the Red Light Camera staff (while Dankanich was outside of the department), undermining him with his staff by:

   A.    advising the staff that Hoch and the other directors weren't happy with Dankanich,

   B.    telling the staff that they did not need to listen to Dankanich anymore,

   C.    advising the staff to report any issues–emphasizing 'any'–to either Hoch or Plaintiff-Relator Marrandino, and

   D.    making it clear to staff that Dankanich would not be with the Parking Authority much longer.

176. Further, employees were specifically directed to write incident reports on Plaintiff-Relator Dankanich in order to get him terminated, and it was suggested that employees that failed to cooperate would not get as much overtime.

177. Shortly thereafter, Lauren Bielski, an employee of the Red Light Department came to Plaintiff-Relator Marrandino alleging that Plaintiff-Relator Dankanich had harassed and bullied her.

178. Ms. Bielski similarly owed her position with the Parking Authority to Defendant Fenerty's patronage, as Fenerty and Bielski's father were close friends.

179. Plaintiff-Relator Dankanich had raised numerous performance issues regarding Ms. Bielski with Defendant Hoch, however Hoch had told Dankanich not to write her up–due to her relationship with Fenerty.

180. Upon information and belief, Defendants Hoch and Fenerty, either directly or indirectly, arranged for Ms. Bielski to make these complaints in order to have Plaintiff-Relator Dankanich terminated.

181.  Plaintiff-Relator Marrandino, despite his belief that these complaints were spurious, was required by Parking Authority policy to report any complaints both to his superior and to human resources, which he did.

182.  Upon reporting the incident to Human Resources, Plaintiff-Relator Marrandino was asked to complete an incident about the complaint. Marrandino advised them that he was present during the relevant times, but that he didn't witness any behavior by Plaintiff-Relator Dankanich that seemed either bullying or harassing.

183.  Plaintiff-Relator Dankanich was subsequently discharged from the Parking Authority, despite several witnesses—including Plaintiff-Relator Marrandino—stating that there was no inappropriate behavior.

184.  After Plaintiff-Relator Dankanich was terminated, Defendant Hoch unofficially placed Plaintiff-Relator Marrandino in charge of Red Light Camera and directed the employees of the department to work under Marrandino's supervision. Hoch also advised Marrandino that he wanted to promote him to the manager's position.

185.  However, Defendant Hoch also informed Plaintiff-Relator Marrandino that Defendant Xerox/Conduent was not going to be excluded from the contract bidding, because "[Xerox/Conduent] had changed their name" and he "couldn't exclude them."

186.  Upon finding this out, Plaintiff-Relator Marrandino refused any promotion, stating that he didn't want to be the manager of the department, particularly if the contract was just going to be awarded to Defendant Xerox/Conduent despite their serious contract problems.

187.  Defendant Hoch and Plaintiff-Relator Marrandino had briefly argued regarding the contract bid, where Marrandino told Hoch that he felt the "whole [bid and contract] was a sham," particularly after Defendant Xerox/Conduent had just been given their money back.

188.  At this point, Plaintiff-Relators Dankanich and Marrandino had in contact, as Dankanich had wanted Marrandino to provide a statement or testimony

related to his firing, as he was undergoing both administrative appeals as well as planning to sue for wrongful termination.

189.   While Plaintiff-Relator Marrandino did not make it known at the Parking Authority that he had been in communication with Plaintiff-Relator Dankanich, it somehow became known, after which Marrandino's working conditions dramatically worsened.

190.   Defendant Fenerty arranged to have a new employee transferred to the Red Light Camera Department, Mr. Lance Lepchuk. Lepchuk was also another associate of Defendant Fenerty from the Republican party, and also owed his job to Fenerty due to patronage and was being transferred because he had lost his position in the Parking Authority's Taxicab and Limo Department.

191.   Plaintiff-Relator Marrandino was advised by Defendant Hoch that Mr. Lepchuk was being transferred to work as a clerk, but immediately upon joining the department moved into the manager's office and began conducting meetings with Defendant Xerox/Conduent, where Marrandino was specifically excluded.

192.   Further, at this point, Plaintiff-Relator Marrandino began to be ostracized by the Red Light Camera department, and his meetings with Defendant Hoch— previously multiple times daily in both a professional and personal capacity— abruptly ceased.

193.   Plaintiff-Relator Marrandino believed that Defendant Hoch was working behind him back in the same manner that he had Plaintiff-Relator Dankanich's. Marrandino attempted to raise this issue with Hoch, who denied it, but quickly ended any further conversation.

194.   Shortly thereafter, Plaintiff-Relator Marrandino was directed by Ms. O'Conner (who, upon information and belief was acting on behalf of Director Hoch) that Marrandino needed to train Mr. Lepchuk on how to perform the Quality Assurance role.

195.   At this point, Plaintiff-Relator Marrandino had been suffering the effects of stress, including anxiety and panic attacks, for several weeks, as he correctly believed that they were planning on terminating him, which was exacerbated when he was effectively ordered to train his replacement.

196.  At a regularly scheduled physician's appointment, Plaintiff-Relator Marrandino told his doctor about his symptoms, who placed him on medical leave due to the deleterious effect the stress was having on his other health conditions, including diabetes and heart problems.

197.  Plaintiff-Relator Marrandino was being monitored by his physician regularly and stayed in compliance with the requirements of the Parking Authority for being on medical leave, and at the beginning of July spoke to Defendant Hoch's secretary, advising her that he was doing better and planned to return at the end of the month.

198.  Shortly thereafter on July 9th, 2017, the Parking Authority director of human resources, Mr. Bill Raymond, contacted Plaintiff-Relator Marrandino and informed him that he had been "out of compliance" per Defendant Hoch, and "effective today," he was given the choice between "resignation, retirement, or termination."

199.  Plaintiff-Relator Marrandino denied that he was out of compliance, and further that the "sick check" employee had been to his house the preceding Friday. He also stated that Defendant Hoch nor anyone at the Parking Authority had ever advised him of any compliance issues prior to that point.

200.  Nonetheless, Mr. Raymond advised Plaintiff-Marrandino had no other options, and Marrandino subsequently chose retirement, and advised that he could come in to complete the paperwork on July 11th, 2017.

### Renewal Award to Xerox/Conduent

201.  On March 10th, 2017, the Parking Authority opened a Request for Proposals for a new contract for the Red Light Photo Enforcement program in the City of Philadelphia. (Exhibit D), notably only nine days after Plaintiff-Relator Dankanich was terminated.

202.  Defendant Xerox/Conduent's proposal was substantially the same in 2017 as it had been under the 2014 Award, utilizing the same technology that had proven ineffective for the prior three years under the contract.

203.   Further, Defendant Xerox/Conduent continued to make the same representations regarding the capabilities of their system as being capable of "multi-vehicles in multi-lanes simultaneously" that this technology had been proven incapable of performing.

204.   Despite that Defendant Xerox/Conduent's technology never functioned to the specification of the contract, nor the fact that Conduent still knowingly and falsely represented their system capabilities, the Parking Authority still awarded the contract to Conduent, this time for a five-year renewal, starting in September 1st, 2017 (Exhibit C).

205.   Notably, the $75.00 set-off penalty was still included in both the 2017 Request for Proposals and the contract awarded to Defendant Xerox/Conduent, even though Conduent had demonstrated they had no intention of paying them.

## PROCEDURAL NOTES

206.   Prior to their terminations, both Plaintiff-Relators Dankanich and Marrandino regularly and repeatedly reported this information to their superiors at the Parking Authority, including Defendant Fenerty, Hoch, and Ms. O'Conner, all of whom are City employees.

207.   Upon his termination, Plaintiff-Relator Dankanich made numerous attempts to bring this to the attention of authorities, including City, State, and Federal, including Philadelphia Councilman David Oh, Councilwoman Helen Gym's office, the Philadelphia City Controller, and the Pennsylvania Attorney General. These attempts began shortly after his termination in March of 2017 and continuing through most of the summer and dealt with both the fraudulent conduct on the part of Defendants as well as Dankanich's wrongful termination.

208.   In the summer of 2017, as a result of these reports, both Plaintiff-Relators Dankanich and Marrandino were interviewed by the Federal Bureau of Investigation, whom they believed would be able to address the Defendants' fraudulent conduct.

209.    Any and all public disclosures arising from the events in this Complaint are the result of the Plaintiff-Relator's efforts to get attention on these matters, which included speaking to numerous members of the press, where they jointly were the primary source of information.

210.    There is no pending criminal, civil or administrative actions/proceedings of which the City is already a party, and further the City has failed to act on this information for more than six months.

## NEXUS OF CITY FUNDS

211.    The Parking Authority has extensive contracts—statutory and otherwise—with the City of Philadelphia, including for On-Street Parking, parking operations at the Philadelphia International Airport, and more than 75% the Parking Authority's total revenue is derived from these contractual relationships with the City.

212.    Revenues generated from On-Street Parking belong to the City of Philadelphia, and are merely collected by the Parking Authority, which is required to remit them to the City and School District of Philadelphia less expenses.

213.    The monies generated by On-Street Parking are the primary source of liquidity for the Parking Authority. Upon information and belief, these monies are commingled by the Parking Authority for their convenience. As a result, these City monies are used by the Parking Authority for their operations, and remitted periodically and in a manner to maintain solvency for the Parking Authority.

214.    Next, while direct expenses are paid by each division respectively, the Parking Authority has significant administrative overhead, which is allocated across the division proportionately by comparing direct expenses to total agency expenses. As a result, the City of Philadelphia ends up carrying the primary burden for indirect expenses onto the City due to the high direct expenses (e.g. manpower) of On-Street and Airport operations.

215.   The Philadelphia Parking Authority is authorized to collect Red Light Camera fines on behalf of the Commonwealth of Pennsylvania, and remits those fines to the State less operating expenses. Those operating expenses also include a proportion of indirect administrative costs using the same formula.

216.   However, many of the individuals involved in the day to day supervision of the Red Light Camera program were or are charged to indirect or administrative costs, including Relator Marrandino, Defendant Hoch, and Ms. O'Conner. In fact, the only Parking Authority employee regularly attending the Red Light Camera weekly meetings that was properly costed was Relator Dankanich: all other employees were costed elsewhere despite their intimate involvement and supervision of the program.

217.   Therefore, the Red Light Camera department incurs disproportionate indirect costs upon the Parking Authority, which was not reflected in their allocation of administrative overhead, which resulted in the City of Philadelphia paying for some of their overhead costs.

218.   As a result, the Parking Authority is a "Contractor" with the City of Philadelphia, and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

219.   The Red Light Camera Department is authorized to deduct operating costs from the program fees that would be remitted to the State. However, the Parking Authority calculates administrative overhead costs proportionally based upon the program's direct costs against the all agency costs.

220.   However, due to the intimate involvement of numerous executives in this program (as only one member of the Red Light Committee or attendee of the weekly meetings was actually charged to the Red Light Program), this resulted in a disproportionate allocation of costs to the City of Philadelphia.

221.   Further, the Parking Authorities' fraud and mismanagement of the Red Light program deprives the City of Philadelphia of significant funding by means of State transportation grants that the City would have priority on for fines generated within municipal limits.

222.  Finally, all assets of the Parking Authority (less liabilities) shall ultimately be returned to the City of Philadelphia upon the Parking Authority's dissolution or expiration (which occurs in 2037). Therefore, the City has significant interest in the operations and management of the Parking Authority, especially when confronted with fraud and unpaid penalties of this magnitude with long-lasting impact on the finances of the agency.

## COUNT #1
## FALSE CLAIMS §§ 19-3600 *ET SEQ.*
## PHILA. VS. CONDUENT (UNPAID PENALTIES)

223.  Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

224.  Defendant Conduent State & Local Services is and was the vendor of the Philadelphia Parking Authority's Red Light Camera system continually beginning in 2014, since their initial award as "Xerox State & Local Services" and for their subsequent five-year renewal in 2017 as Conduent.

225.  At all times relevant hereto, Defendant Xerox/Conduent had actual and/or constructive knowledge of their failures to perform under their respective contracts with the Parking Authority and that they were not entitled to full payment thereof.

226.  At all times relevant hereto, Defendant Xerox/Conduent were subject to $75.00/hour penalties in their respective contracts for system downtime.

227.  Despite the clear contractual provisions, Defendant Xerox/Conduent demanded full payment for periods they were not entitled to due to system down-time and refused to accept even reduced penalties for their contractual failures.

228.  Defendant Xerox/Conduent acted in concert with Defendants Fenerty and Hoch to improperly eliminate any penalty from their payments during the terms of their contract.

229. Defendant Parking Authority is a "Contractor" with the City of Philadelphia, as defined by the Philadelphia False Claims Law § 19-3601 (1), and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

230. Each payment to Defendant Xerox/Conduent constitutes a "request or demand," made to a contractor, under the Philadelphia False Claims Law § 19-3601 (1).

231. Some portion of the money involved in these payments was "provide[d]" or "reimburse[d]" (directly or indirectly) by the City of Philadelphia, under the Philadelphia False Claims Law § 19-3601 (1).

232. Therefore, each payment made to Defendant Xerox/Conduent constitutes a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

233. Each Claim received by Defendant Xerox/Conduent was made "knowing or knowingly," under the Philadelphia False Claims Law § 19-3601 (5).

234. Each Claim knowingly received by Defendant Xerox/Conduent, despite their actual and/or constructive knowledge that Xerox/Conduent was not entitled to the full amount of payment, constitute a "False Claim" under the Philadelphia False Claims Law § 19-3601 (5).

235. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (1) as they "knowingly [] causes to be presented to an officer or employee of the City a false claim for payment or approval by the City[.]"

236. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (3) as they "conspire[d] to defraud the City by getting a false claim allowed or paid by the City."

237. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (7) as they "knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City."

238.   Each payment received by Defendant Xerox/Conduent constitutes a separate and independent violation of the Philadelphia False Claims Law.

239.   Each violation by Defendant Xerox/Conduent of the Philadelphia False Claims Law also constitutes a "Class III offense" under § 1-109 (3) with a maximum $2,000 fine in addition to the City's other remedies.

240.   Further, Defendant Xerox/Conduent is jointly and severally liable for all damages to the City of Philadelphia for these False Claims, including trebled damages and mandatory attorney's fees and costs.

   WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the City of Philadelphia and against Defendant Conduent State & Local Services in an amount in excess of $50,000 including compensatory and trebled damages, interest, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper, which may include referral to the City of Philadelphia's Director of Finance with a recommendation for suspension and/or debarment.

### COUNT #2
### FALSE CLAIMS §§ 19-3600 *ET SEQ.*
### PHILA. VS. CONDUENT (FRAUDULENT AWARD)

241.   Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

242.   Defendant Conduent State & Local Services is and was the vendor of the Philadelphia Parking Authority's Red Light Camera system continually beginning in 2014, since their initial award as "Xerox State & Local Services" and for their subsequent five-year renewal in 2017 as Conduent. (Hereinafter referred to as "Xerox/Conduent").

243.   In 2013, Defendant Xerox/Conduent made representations to the Parking Authority during the Red Light Camera system bid process which included that Defendant Xerox/Conduent's Red Light Camera system was required to be capable of capturing multiple lanes with parallel events.

244.   Defendant Xerox/Conduent either knew or should have known that these representations were untrue due to technological limitations of radar yet continued to make these false representations as they knew they would be otherwise excluded from bidding on the contract.

245.   Further, Defendant Xerox/Conduent acted in concert with Defendants Fenerty and Hoch to improperly influence the award of the contract, in violation of ethical standards and the laws of Pennsylvania, including providing confidential bid information from other vendors, allowing Xerox to "rebid" to ensure they were the lowest bidder, sharing confidential committee information with the vendor, and exerting improper influence on the committee.

246.   These actions by Defendants Xerox/Conduent, Fenerty, and Hoch to ensure the improper award of the contract to Xerox constituted a conspiracy to commit fraud, and due to this conspiracy between the defendants, the Parking Authority did not properly eliminate Xerox/Conduent as a responsible bidder

247.   The Parking Authority suffered proximate damages from Defendant Xerox/Conduent's fraud in their regular and continual payments for a defective and nonconforming system, which totaled approximately $18 million dollars.

248.   As Defendant Xerox/Conduent was awarded the 2017 Red Light Camera contract under fraudulent circumstances, the total demand and all later demands for installment payment thereunder are similarly fraudulently made.

249.   Defendant Parking Authority is a "Contractor" with the City of Philadelphia, as defined by the Philadelphia False Claims Law § 19-3601 (1), and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

250.   Each payment to Defendant Xerox/Conduent constitutes a "request or demand," made to a contractor, under the Philadelphia False Claims Law § 19-3601 (1).

251.   Some portion of the money involved in these payments was "provide[d]" or "reimburse[d]" (directly or indirectly) by the City of Philadelphia, under the Philadelphia False Claims Law § 19-3601 (1).

252. Therefore, each payment made to Defendant Xerox/Conduent constitutes a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

253. Each Claim received by Defendant Xerox/Conduent was made "knowing or knowingly," under the Philadelphia False Claims Law § 19-3601 (5).

254. Each Claim knowingly received by Defendant Xerox/Conduent, despite their actual and/or constructive knowledge that Xerox/Conduent was not entitled to the full amount of payment, constitute a "False Claim" under the Philadelphia False Claims Law § 19-3601 (5).

255. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (1) as they "knowingly [] causes to be presented to an officer or employee of the City a false claim for payment or approval by the City[.]"

256. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (3) as they "conspire[d] to defraud the City by getting a false claim allowed or paid by the City."

257. Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (7) as they "knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City."

258. Each payment received by Defendant Xerox/Conduent constitutes a separate and independent violation of the Philadelphia False Claims Law.

259. Each violation by Defendant Xerox/Conduent of the Philadelphia False Claims Law also constitutes a "Class III offense" under § 1-109 (3) with a maximum $2,000 fine in addition to the City's other remedies.

260. Further, Defendant Xerox/Conduent is jointly and severally liable for all damages to the City of Philadelphia for these False Claims, including trebled damages and mandatory attorney's fees and costs.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the City of Philadelphia and against Defendant Conduent State & Local Services in an

amount in excess of $50,000 including compensatory and trebled damages, interest, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper, which may include referral to the City of Philadelphia's Director of Finance with a recommendation for suspension and/or debarment.

## COUNT #3
## FALSE CLAIMS §§ 19-3600 *ET SEQ.*
## PHILA. VS. CONDUENT (FRAUDULENT RENEWAL)

261.  Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

262.  Defendant Conduent State & Local Services is and was the vendor of the Philadelphia Parking Authority's Red Light Camera system continually beginning in 2014, since their initial award as "Xerox State & Local Services" and for their subsequent five-year renewal in 2017 as Conduent. (Hereinafter referred to as "Xerox/Conduent").

263.  In 2013, Defendant Xerox/Conduent made representations to the Parking Authority during the Red Light Camera system bid process, which were proven to be false.

264.  One of these representations was that Defendant Xerox/Conduent's Red Light Camera system was required to be capable of capturing multiple lanes with parallel events, however by 2017 system was proven technically incapable of capturing parallel events in multiple lanes.

265.  Therefore, despite Defendant Xerox/Conduent's actual knowledge that their system was incapable of performing in the manner specified, Xerox/Conduent neither improved or changed their system, but instead simply continued to falsely represent their system capabilities through the renewal bidding process.

266.  While the Parking Authority was internally aware of these limitations and they had been brought to the attention of both Defendants Hoch and Fenerty, they were directly and improperly working to ensuring that Defendant

Xerox/Conduent was awarded a renewal of this contract, despite the false representations and proven inability to meet the requirements of the contract.

267.   The improper actions made by Defendant Hoch and Defendant Fenerty to ensure that Defendant Xerox/Conduent continued as the vendor for the Red Light Camera system constituted a conspiracy to defraud the City of Philadelphia.

268.   Due to this conspiracy between Defendants Xerox/Conduent, Hoch and Fenerty, the Parking Authority as an entity justifiably relied on the fraudulent representations made by Xerox/Conduent and did not eliminate them as a responsible bidder due to their proven inability to successfully perform and complete the contract.

269.   As a result, the Parking Authority awarded Defendant Xerox/Conduent the renewal of their Red Light Camera system, and thereafter suffered proximate damages from Defendant Xerox/Conduent's fraud in their regular and continual payments for a defective and nonconforming system, which will total an estimated $75 million dollars.

270.   As Defendant Xerox/Conduent was awarded the 2017 Red Light Camera contract under fraudulent circumstances, both the total demand and all later demands for installment payment thereunder are similarly fraudulently made.

271.   Defendant Parking Authority is a "Contractor" with the City of Philadelphia, as defined by the Philadelphia False Claims Law § 19-3601 (1), and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

272.   Each payment to Defendant Xerox/Conduent constitutes a "request or demand," made to a contractor, under the Philadelphia False Claims Law § 19-3601 (1).

273.   Some portion of the money involved in these payments was "provide[d]" or "reimburse[d]" (directly or indirectly) by the City of Philadelphia, under the Philadelphia False Claims Law § 19-3601 (1).

274.   Therefore, each payment made to Defendant Xerox/Conduent constitutes a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

275.   Each Claim received by Defendant Xerox/Conduent was made "knowing or knowingly," under the Philadelphia False Claims Law § 19-3601 (5).

276.   Each Claim knowingly received by Defendant Xerox/Conduent, despite their actual and/or constructive knowledge that Xerox/Conduent was not entitled to the full amount of payment, constitute a "False Claim" under the Philadelphia False Claims Law § 19-3601 (5).

277.   Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (1) as they "knowingly [] causes to be presented to an officer or employee of the City a false claim for payment or approval by the City[.]"

278.   Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (3) as they "conspire[d] to defraud the City by getting a false claim allowed or paid by the City."

279.   Each False Claim received by Defendant Xerox/Conduent from the Parking Authority constituted a violation of § 19-3602 (7) as they "knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City."

280.   Each payment received by Defendant Xerox/Conduent constitutes a separate and independent violation of the Philadelphia False Claims Law.

281.   Each violation by Defendant Xerox/Conduent of the Philadelphia False Claims Law also constitutes a "Class III offense" under § 1-109 (3) with a maximum $2,000 fine in addition to the City's other remedies.

282.   Further, Defendant Xerox/Conduent is jointly and severally liable for all damages to the City of Philadelphia for these False Claims, including trebled damages and mandatory attorney's fees and costs.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the City of Philadelphia and against Defendant Conduent State & Local Services in an

amount in excess of $50,000 including compensatory and trebled damages, interest, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper, which may include referral to the City of Philadelphia's Director of Finance with a recommendation for suspension and/or debarment.

## COUNT #4
## FALSE CLAIMS §§ 19-3600 *ET SEQ.*
## PHILA. VS. JAMES F. HOCH

283. Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

284. Defendant James F. Hoch was and is a Director at the Philadelphia Parking Authority, and held, at all times relevant hereto, the Red Light Camera department as part of his portfolio of supervision.

285. Further, Defendant Hoch was, at all times relevant hereto, the designated Project Manager for the Parking Authority, and was responsible for requests for, and final approvals for payment to Defendant Xerox/Conduent.

286. At all times relevant hereto, Defendant Hoch had actual and/or constructive knowledge of the failures by Defendant Xerox/Conduent under their respective contracts and that they were not entitled to full payment thereof.

287. At all times relevant hereto, it was Defendant Hoch's responsibility to ensure that the relevant penalty of $75.00/hour was properly set-off against the monthly payment to Defendant Xerox/Conduent.

288. Despite the clear contractual provisions and recommendations by his staff, Defendant Hoch failed to apply the required set-offs and approved the full payments from the Parking Authority to Defendant Xerox/Conduent, for at least 22 months, from the period of January '17 until present.

289. Defendant Hoch acted in concert with the other Defendants to improperly eliminate any penalty from their payments during the terms of their contract.

290.  Defendant Parking Authority is a "Contractor" with the City of Philadelphia, as defined by the Philadelphia False Claims Law § 19-3601 (1), and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

291.  Defendant Hoch is an "officer, director, employee" of the Parking Authority, and is not a "city official or employee" as required by the Philadelphia False Claims Law § 19-3601 (2).

292.  Each payment approved by Defendant Hoch to Defendant Xerox/Conduent constitutes a "request or demand," made to a contractor, under the Philadelphia False Claims Law § 19-3601 (1).

293.  Some portion of the money involved in these payments was "provide[d]" or "reimburse[d]" (directly or indirectly) by the City of Philadelphia, under the Philadelphia False Claims Law § 19-3601 (1).

294.  Therefore, each payment approved by Defendant Hoch constitutes a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

295.  Each Claim approved by Defendant Hoch was made "knowing or knowingly," under the Philadelphia False Claims Law § 19-3601 (5).

296.  Each Claim knowingly approved by Defendant Hoch, despite his actual and/or constructive knowledge that Xerox/Conduent was not entitled to the full amount of payment, constitute a "False Claim" under the Philadelphia False Claims Law § 19-3601 (5).

297.  Each False Claim approved by Defendant Hoch constituted a violation of § 19-3602 (1) as he "knowingly [] causes to be presented to an officer or employee of the City a false claim for payment or approval by the City[.]"

298.  Each False Claim approved by Defendant Hoch constituted a violation of § 19-3602 (3) as they "conspire[d] to defraud the City by getting a false claim allowed or paid by the City."

299.  Each False Claim approved by Defendant Hoch constituted a violation of § 19-3602 (7) as they "knowingly makes, uses or causes to be made or used a

false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City."

300.   Each payment approved by Defendant Hoch constitutes a separate and independent violation of the Philadelphia False Claims Law.

301.   Each violation by Defendant Hoch of the Philadelphia False Claims Law also constitutes a "Class III offense" under § 1-109 (3) with a maximum $2,000 fine in addition to the City's other remedies.

302.   Further, Defendant Hoch is jointly and severally liable for all damages to the City of Philadelphia for these False Claims, including trebled damages and mandatory attorney's fees and costs.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the City of Philadelphia and against Defendant James F. Hoch in an amount in excess of $50,000 including compensatory and trebled damages, interest, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper.

## COUNT #5
## FALSE CLAIMS §§ 19-3600 *ET SEQ.*
## PHILA. VS. VINCENT J. FENERTY, JR.

303.   Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

304.   Defendant Vincent J. Fenerty, Jr., was Executive Director of the Philadelphia Parking Authority, until September 2016. During that period Fenerty had authority over, and was responsible for, all operations of the Parking Authority, including the Red Light Camera department.

305.   Despite having two levels of Director-level supervision between Defendant Fenerty and the Red Light Camera department, Defendant Fenerty exercised frequent direct control over the operations and finances of the department.

306.   At all times relevant hereto, Defendant Fenerty had actual and/or constructive knowledge of the failures by Defendant Xerox/Conduent under their respective contracts and that they were not entitled to full payment thereof.

307.   In 2015, Defendant Fenerty directed his Internal Audit Manager to conduct an audit/analysis of the Red Light Camera program services provided by Defendant Xerox/Conduent, which reported to him approximately $25 million dollars in penalties due to the Parking Authority.

308.   Upon information and belief, Defendant Fenerty ordered that Defendant Xerox/Conduent be refunded all funds held as set-off for the penalties, and ordered the service be paid-in-full, despite his direct knowledge that their services were noncompliant.

309.   Further, upon information and belief, Defendant Fenerty 'buried' the audit/analysis he commissioned, showing the violations and penalties that were owed by Defendant Xerox/Conduent.

310.   Defendant Fenerty worked with Defendants Hoch and Xerox/Conduent to improperly eliminate any penalty from Xerox/Conduent's payments during the terms of that contract, which constitutes a conspiracy to defraud the City of Philadelphia.

311.   Defendant Fenerty's ordered refund of the monies held by the Parking Authority to set-off the penalties due to them by Defendant Xerox/Conduent constitute a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

312.   Also, Defendant Fenerty's order that the Parking Authority ignore the required set-offs and approve the full payments from the Parking Authority to Defendant Xerox/Conduent, for at least 22 months, from the period of January '17 until present.

313.   Defendant Parking Authority is a "Contractor" with the City of Philadelphia, as defined by the Philadelphia False Claims Law § 19-3601 (1), and Defendant Xerox/Conduent was a "subcontractor" of the Parking Authority as defined by the Philadelphia False Claims Law § 19-3601 (2).

314.   Defendant Fenerty is an "officer, director, employee" of the Parking Authority, and is not a "city official or employee" as required by the Philadelphia False Claims Law § 19-3601 (2).

315.   Each payment ordered paid by Defendant Fenerty to Defendant Xerox/Conduent constitutes a "request or demand," made to a contractor, under the Philadelphia False Claims Law § 19-3601 (1).

316.   Some portion of the money involved in these payments was "provide[d]" or "reimburse[d]" (directly or indirectly) by the City of Philadelphia, under the Philadelphia False Claims Law § 19-3601 (1).

317.   Therefore, each payment ordered paid by Defendant Fenerty constitutes a "Claim" under the Philadelphia False Claims Law § 19-3601 (1).

318.   Each Claim ordered paid by Defendant Fenerty was made "knowing or knowingly," under the Philadelphia False Claims Law § 19-3601 (5).

319.   Each Claim knowingly ordered paid by Defendant Fenerty, despite his actual and/or constructive knowledge that Xerox/Conduent was not entitled to the full amount of payment, constitute a "False Claim" under the Philadelphia False Claims Law § 19-3601 (5).

320.   Each False Claim ordered paid by Defendant Fenerty constituted a violation of § 19-3602 (1) as he "knowingly [] causes to be presented to an officer or employee of the City a false claim for payment or approval by the City[.]"

321.   Each False Claim ordered paid by Defendant Fenerty constituted a violation of § 19-3602 (3) as they "conspire[d] to defraud the City by getting a false claim allowed or paid by the City."

322.   Each False Claim ordered paid by Defendant Fenerty constituted a violation of § 19-3602 (7) as they "knowingly makes, uses or causes to be made or used a false record or statement to conceal, avoid or decrease an obligation to pay or transmit money or property to the City."

323.   Each payment ordered paid by Defendant Fenerty constitutes a separate and independent violation of the Philadelphia False Claims Law.

324.   Each violation by Defendant Fenerty of the Philadelphia False Claims Law also constitutes a "Class III offense" under § 1-109 (3) with a maximum $2,000 fine in addition to the City's other remedies.

325.   Further, Defendant Fenerty is jointly and severally liable for all damages to the City of Philadelphia for these False Claims, including trebled damages and mandatory attorney's fees and costs.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the City of Philadelphia and against Defendant Vincent J. Fenerty, Jr. in an amount in excess of $50,000 including compensatory and trebled damages, interest, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper.

## COUNT #6
## RETALIATION § 19-3604
## DANKANICH VS. ALL DEFS.

326.   Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

327.   Plaintiff Andrew J. Dankanich was an employee of the Philadelphia Parking Authority from August 1st, 2000 until March 1st, 2017, and was the Manager of Red Light Camera, and due to that position was a member of the 2017 Red Light Committee.

328.   Defendant Hoch was the first-level director overseeing the Red Light Camera department, and Plaintiff Dankanich reported directly to him.

329.   Prior to his termination, Plaintiff Dankanich had repeatedly raised problems with Defendant Hoch and Defendant Fenerty, which were appropriately raised with his chain of command, including Hoch, Ms. O'Conner, and Fenerty, and raised legitimate issues of fraud and false claims.

330.   Defendants Fenerty and Hoch had an ongoing and inappropriate relationship with Defendant Xerox/Conduent, where they were seeking to promote

Conduent's interests at the expense of the Parking Authority and the City of Philadelphia, in violation of § 19-3600 *et seq.*

331. To ensure Plaintiff Dankanich could not interfere with any future (and wrongful) renewal award of the Red Light Contract, Defendants Fenerty and Hoch arranged to have Dankanich wrongfully discharged from his position. These were taken both for the benefit of Fenerty and Hoch as well as the benefit of Defendant Xerox/Conduent.

332. Plaintiff Dankanich was discharged due to lawful acts which included investigation, reporting, and other assistance to attempt to end the ongoing fraud and prevent future fraud on the Parking Authority and City of Philadelphia, in violation of § 19-3604 (1), and this discharge was retaliatory in nature.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the Plaintiff-Relator Andrew J. Dankanich, and against Defendants Philadelphia Parking Authority, Conduent State & Local Services, Vincent J. Fenerty, Jr. and James F. Hoch, in an amount in excess of $50,000 including reinstatement with the same seniority status, back pay, interest on back pay, compensatory and special damages, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper.

## COUNT #7
## RETALIATION § 19-3604
## MARRANDINO VS. ALL DEFS.

333. Relator incorporates by reference paragraphs 1 to 222 above as if fully set forth herein.

334. Plaintiff Nicholas A. Marrandino was an employee of the Philadelphia Parking Authority from June 18th, 2012 until July 9th, 2017, where was the Quality Assurance Officer from 2014 until his termination, and due to that position was a member of the 2017 Red Light Committee.

335.   Defendant Hoch was one of Plaintiff Marrandino's direct supervisors, and the director for which he did the majority of his work at the Philadelphia Parking Authority between 2014 and 2017.

336.   Prior to his termination, Plaintiff Marrandino had repeatedly raised problems with Defendant Hoch and Defendant Fenerty, which were appropriately raised with his chain of command, including Hoch, Ms. O'Conner, and Fenerty, and raised legitimate issues of fraud and false claims.

337.   Defendants Fenerty and Hoch had an ongoing and inappropriate relationship with Defendant Xerox/Conduent, where they were seeking to promote Conduent's interests at the expense of the Parking Authority and the City of Philadelphia, in violation of § 19-3600 *et seq.*

338.   Defendant Fenerty directly ordered Plaintiff Marrandino to "have [Plaintiff Dankanich] terminated"–despite Fenerty's resignation from the Parking Authority–which Plaintiff Marrandino refused.

339.   Despite this, Plaintiff Dankanich was later wrongfully terminated from the Parking Authority by Defendants Hoch and Fenerty.

340.   After Plaintiff Dankanich was terminated, it became apparent to Defendants' Fenerty and Hoch that Plaintiff Marrandino was not going to cooperate in their scheme to ensure Defendant Xerox/Conduent was awarded a renewal of the Red Light Camera contract.

341.   Upon information and belief, Defendant Fenerty and Hoch had concerns that Plaintiff Marrandino might be cooperating with authorities, potentially including the Federal Bureau of Investigation.

342.   Further, Defendant Fenerty and Hoch were both concerned that Plaintiff Marrandino might interfere with any renewal award for Defendant Xerox/Conduent due to his responsibilities involving the investigation and recovery of penalty moneys that were no longer being withheld.

343.   Once it became known to Defendants Hoch and Fenerty that Plaintiff Marrandino was communicating with and/or cooperating with Plaintiff Dankanich after he was terminated, Hoch and Fenerty arranged for

Marrandino's working conditions to worsen, whereupon he lost responsibility and was ordered to train his replacement.

344. However, Plaintiff Marrandino began to have health effects due to the stress of his (correct) belief in his impending termination and went out on sick leave under physician's supervision.

345. In July, after informing Defendant Hoch's secretary that he was starting to feel better and would be returning to work, he was promptly contacted by Human Resources and told that he was out of compliance, and given the options between "termination, resignation, or retirement."

346. Upon information and belief, it is notable that at this point Defendant Xerox/Conduent had not yet fully secured the renewal of their award.

347. While Plaintiff Marrandino chose retirement, this was under duress to save what little benefit he had accrued, and therefore constitutes constructive termination.

348. Plaintiff Marrandino was discharged due to lawful acts which included investigation, reporting, and other assistance to attempt to end the ongoing fraud and prevent future fraud on the Parking Authority and City of Philadelphia, in violation of § 19-3604 (1), and this discharge was retaliatory in nature.

WHEREFORE, Plaintiff-Relators demand that judgement be entered in the favor of the Plaintiff-Relator Nicholas A. Marrandino, and against Defendants Philadelphia Parking Authority, Conduent State & Local Services, Vincent J. Fenerty, Jr. and James F. Hoch, in an amount in excess of $50,000 including reinstatement with the same seniority status, back pay, interest on back pay, compensatory and special damages, costs of suit, statutory attorney's fees, and any other relief this Court may deem just and proper.

# CERTIFICATE OF SERVICE

I, Andrew B. Austin, do hereby certify that a true and correct copy of this proposed Complaint, made on behalf of Plaintiff-Relators Andrew J. Dankanich and Nicholas A. Marrandino was submitted in accordance with Philadelphia Code § 19-3603 (2) (a) (Civil Actions for False Claims) to the Philadelphia City Solicitor and Law Department via electronic and first class mail, on the date listed below.

**Andrew B. Austin, Esq.**
*Attorney for the Plaintiff-Relators*
PA Bar # 323768
+1 (610) 656-1956
austin@stackhousegroup.com

DATE:  10/18/2018