UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Andrew **Dankanich** and Nicholas **Marrandino**, *Plaintiff(s)*; *vs.* Marcel **Pratt** and City of **Philadelphia**, *Defendant(s)*. | *No.* 19-CV-735 (MSG) |

## [PROPOSED] ORDER

**AND NOW**, this _____ day of _____, 2019, upon consideration of the Defendants' renewed Motion to Dismiss and Motion to Strike (Doc. No. 11), and Plaintiffs' responses thereto, this Court hereby **PARTIALLY GRANTS** and **PARTIALLY DENYS** the motion, and **ORDERS** the following:

1. Defendants' Motion to Strike is **DENIED**.

2. Defendants' Motion to Dismiss Counts # 6 and # 7 *with prejudice* are **GRANTED**.

3. Defendants' Motion to Dismiss all other Counts are **DENIED**.

**BY THE COURT:**

_____

**Hon. Mitchell S. Goldberg**
United States District Judge

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| Andrew **Dankanich** and Nicholas **Marrandino**, *Plaintiff(s)*; *vs.* Marcel **Pratt** and City of **Philadelphia**, *Defendant(s)*. | *No.* 19-CV-735 (MSG) |

## BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND MOTION TO STRIKE

Plaintiffs' present this Brief in Opposition to Defendant's combined Motion to Dismiss and Motion to Strike, requesting this Court deny Defendant's Motion to Strike and deny Defendant's Motion to Dimiss except with regard to Counts # 6–7

## BACKGROUND

Plaintiffs have provided a well-founded pleading in their Amended Complaint, making a number of damning allegations against the Defendants. To briefly summarize: Plaintiffs had proposed a lawsuit under the Philadelphia False Claims Ordinance ("FCO") for fraud committed upon the City of Philadelphia by Conduent State and Local Service ("Conduent") and the Philadelphia Parking Authority ("PPA") of at least $9 million dollars. Plaintiffs presented their complaint to the City where, without adequate investigation, the Defendants summarily dismissed Plaintiffs' lawsuit in a six-minute phone call **without explanation.**

Refusing to accept the Defendants' wrongful denial of their claim, Plaintiffs' struggled to even find out *why* Defendants refused their claims. Throughout the process, Defendants, through their designated representative, Diana Cortes, have worked to be as opaque as possible to the Plaintiffs, including claiming that legal authority existed for Defendant's denial, while refusing—at any point—to provide it to Plaintiffs. However, Plaintiffs doggedly pursued their claim, eventually forcing the Defendants to commit to at least providing the

*reasons* for their denial. Plaintiffs were easily able to refute these reasons, only to have Defendants continue to reject the claim. Over six months, Defendants moved from pretext to pretext for their denial, determined to reject this claim—without any consideration for its merit or the millions of dollars that this City would recover.

Plaintiffs' back-and-forth finally culminated with a meeting with the City Solicitor's office, where they brought in their resident 'expert,' who ultimately agreed with Plaintiffs' claims, much to the chagrin of Ms. Cortes and also promptly ended the meeting. Then, Ms. Cortes writes her final denial in an emailed letter, using as justification a 'lack of damages' to the City. This was despite the $9 million dollars that was defrauded from the City which Ms. Cortes' (allegedly thorough) 'investigation' failed to uncover, as well as the fact that **damages are not a required element** of the FCO.

In their Amended Complaint, Plaintiffs allege that the reason for the Defendants denial of their claims was because their proposed complaint implicated Vincent Fenerty, former executive director of the PPA, in fraud. Mr. Fenerty is a powerful and politically connected individual with extensive and untoward relationships with numerous individuals in Philadelphia politics—including the Mayor of Philadelphia, James Kenney. Additionally, Plaintiffs proposed complaint also implicated a number of other 'power players' in Philadelphia, including close personal allies of the Mayor: two powerful union leaders, John "Johnny Doc" Doughterty and Joseph Ashdale, as well as Clarena Tolsen, who was appointed as interim Executive Director of the PPA (from her senior position in City Hall) upon Mayor Kenney's recommendation.

Knowing of these relationships, Defendants decided the politically expedient solution was to cover-up this fraud rather than pursue it. This was decided by the City Solicitor's office to avoid damaging their boss, the Mayor of Philadelphia, as well as the Mayor's political allies. As a result, the Defendants' rejection was not based in fact or law, but was rather a pretext to cover-up corruption within the City government.

Finally, when Plaintiffs contacted the Defendants regarding this federal lawsuit, Defen-

dants **demanded** that Plaintiffs file this case under seal—literally minutes before Plaintiffs' Counsel went to the Courthouse—informing them that to do otherwise was to "proceed at your own risk." Defendants further claimed that confidentiality under the FCO "obviously" extended to "the discussions you had with the City Solicitor's office" as well as "the information you plan to include in the proposed Complaint." In short, Defendants claim that Plaintiffs could not discuss *anything* to do with their Complaint due to the FCO's confidentiality provision without limitation—as if the First Amendment did not exist at all.

Defendants spend the majority of their motion trying to discredit these factual allegations, including making an affirmative pleading in the form of seven-plus pages of extensive 'introduction' and 'background' information. Defendants begin their motion with a spurious attempt to strike Plaintiffs' most damaging allegations, splitting their attention between the 'scandalous' nature of the pleadings and backhanded attempts at calling Plaintiffs (and their Counsel) liars. However, these pleadings are truthful, carefully investigated, and accurate, as evidenced by the fact that both Plaintiffs' *and their Counsel* properly signed and verified the Amended Complaint under penalty of perjury and in strict compliance with Fed. R. Civ. P. 11 (b).

Defendants focus on discrediting the Plaintiffs' factual allegations is also poorly-considered. First, there is the inherent "me thinks the lady protest too much" problem of Defendants' claims: they can not—with a straight face—attempt to argue that corruption isn't a major problem with our City government, or that the senior members of our government are simply unaware.[1] Second, Defendants arguments fail to take into account the standard for review: all facts and reasonable inferences must be viewed in the light most favorable

---

[1] In the last few years, Philadelphia lost a District Attorney and U.S. Congressman to federal prison. Another U.S. Congressman 'retired' due to a bribery scandal, but did not leave his position as Chair of the Philadelphia Democratic Party. There is an active indictment against a sitting Councilman—who is likely to win reelection—that also implicates or names many of the same people that Plaintiffs complain the Defendants are trying to protect. *See generally* Anna Orso & Mark Dent, *Why at least 39 Philly politicians got investigated over the last 15 years*, Billy Penn (Aug. 25 2015, updated Jun. 29, 2017), *available at* `https://billypenn.com/2015/08/25/why-at-least-39-philly-politicians-got-investigated-over-the-last-15-years/`; Aaron Kase, *Is Philadelphia the Most Corrupt City in America?*, Vice (Mar. 28 2017) *available at* `https://www.vice.com/en_us/article/jp3vak/is-philadelphia-the-most-corrupt-city-in-america`

to the nonmovant.  In attempting to twist the facts to make them more palatable to this Court, Defendants draw attention to their wrongful conduct, as the Court must disregard the 'positive spin' that is being put on them.  Third, Defendants argument manages to detail exactly how specific Plaintiffs' pleading is, and the number of allegations supported by facts contained in the complaint.  Defendants attempts to factually persuade this Court demonstrates that Plaintiffs' Amended Complaint contains more than enough information to survive a Motion to Dismiss.

Instead, Defendants would have better spend their time addressing their legal arguments for dismissal, which—aside from three cogent arguments—are entirely undeveloped.[2]  Those three arguments are:  (1) Plaintiffs have not shown a protected property interest.  (2) the FCO would survive rational basis review.  (3) Local Agency Law provides additional procedural protections that would destroy Plaintiffs' procedural claims.  Plaintiffs have organized this brief logically starting with the standard of review and discussion of the motion to strike before moving on to address each of these arguments in turn.  Finally, Plaintiffs attempt to address the balance of Defendants' other arguments, where they could be understood.

## ARGUMENT

### Standard of Review

1.  **Plaintiffs plead facts in their complaint sufficient to show constitutional violations of their rights sufficient to survive a Motion to Dismiss.**

A complaint will survive a motion to dismiss when, construed "in the light most favorable to the plaintiff", *Santomenno ex rel. John Hancock Tr. v. John Hancock Life Ins. Co.*, 768 F.3d 284, 290 (3d Cir. 2014) (internal quotation marks and citation omitted), "contain[s] sufficient factual matter, accepted as true, to state a claim that is plausible on its face[.]" *Bell Atlantic v. Twombly*, 550 U.S. 544, 570 (2006) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662,

---

[2]Many of Defendants' arguments were ill-considered and/or had no legal basis. However, Plaintiff's Counsel tried to address any of Defendants arguments they could understand to allow this Court to disregard them.

4

678 (2009)). However, Courts "disregard rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements", *James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012), but "can provide the complaint's framework [but] must be supported by factual allegations." *Iqbal*, 556 U.S. at 664. A claim has "has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Thompson v. Real Estate Mortg. Network*, 748 F.3d 142, 147 (3d Cir. 2014).

1.1. **Plaintiffs' pleading includes necessary facts related to the Defendants' arbitrary nature of the Defendants' investigation.** Defendants complain that "much of [the Complaint] is simply their *counsel's* subjective impressions of discussions [with Defendants]" which are not "facts" nor are "entitled to any assumption of the truth" for purposes of dismissal. Defendant's Brief (Doc. No. 11) at 7 fn. 4 (quoting *Wells Fargo Bank, N.A. v. CCC Atlantic, LLC*, 2013 WL 637657, \*3 fn. 2 (D.N.J. Oct 17, 2013)). This is is trebly incorrect: (1) This Court can see that the pleadings offered by Plaintiffs are almost entirely objective and fact-based, with minimal subjective commentary. (2) Plaintiffs were represented by Counsel, and all interactions with Defendants were through counsel. It would be impossible to plead necessary facts otherwise. (3) Defendants' authority does not support their argument.

In a footnote to *Wells Fargo*, the Court did not accept the "characterization" of a "20% increase" in tax assessments as "massive". *Wells Fargo Bank, N.A. v. CCC Atlantic, LLC*, 2013 WL 637657, \*3 fn. 2 (D.N.J. Oct 17, 2013). The balance of that case relies on a traditional *Twombly/Iqbal* analysis of ignoring "*legal conclusions* cast in the form of factual allegations, unwarranted inferences, or unsupported conclusions." *Id.* \*5–6 (emphasis added). Similarly in *Choates*—as this Court is well aware—the Plaintiff there was attempting to survive summary judgment because of his "personal feelings and subjective assumptions and beliefs" where "[he] was humiliated by the process and singled out for such treatment because of his race." *Choates v. Aker Phila. Shipyard*, 2018 WL 637657,

9 (E.D. Pa. Jan. 31, 2018). Neither case is analogous to Plaintiffs' pleadings, which are almost entirely in a chronological recitation of the events as they occurred, rather than in any 'legal conclusions' or 'personal feelings or subjective assumptions.'

**1.2.** **Plaintiffs pled the essential factual background to support their pleadings made upon information and belief, and that information is within the control of the Defendants.** Defendants complain that Plaintiffs' pleadings contains a number of allegations made 'upon information and belief', and suggesting that this type of pleading is improper or "could not be supported by a reasonable investigation". Def. Brf. at 8–11, 14–15. However, this is incorrect, both as a matter of law and on the pleadings.

Even under the heightened pleading requirements of Fed. R. Civ. P. 9 (b)—which does not apply here—pleading upon information and belief is permissible, where the allegations are neither "boilerplate nor conclusory" but accompanied with "factual allegations that make their theoretically viable claim plausible." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.*, 311 F.3d 198, 216 (3d Cir. 2002), partially abrogated on other grounds by, *Phillips v. Cnty. of Allegheny*, 515 F.3d 224 (3d Cir.2008). This "essential factual background [is what] would accompany 'the first paragraph of any newspaper story' that is, the 'who, what, when, where and how' of the events at issue." *Id.* at 217 (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1422 (3d Cir. 1997)). Finally, where "requisite factual information is peculiarly within the defendant's knowledge or control, the rigid requirements of Rule 9(b) may be relaxed." *Rockefeller Properties*, 311 F.3d at 216.

Plaintiffs have plainly sketched out information more than the 'first paragraph' of the story, including the nature of relationships between the Defendants and the targets of Plaintiffs' claims, how the individuals benefited from these relationships, and how they worked to conceal or obscure knowledge of the fraud from the public, and included specific allegations of criminal activity tying the Defendants' chief executive to the individual coordinating fraud against the City. This information was the result of the Plaintiffs' knowledge—including facts told to them and believed to be true—and supported by reasonable investigation.

**1.3. Plaintiffs' allegations are truthful, well-founded and properly pled.** Defendant generally complains that Plaintiffs' pleadings are essentially untruthful. However, not only does the standard of review require all facts and allegations be viewed in the light most favorable to the Plaintiffs', but these allegations—notwithstanding Defense Counsel's strenous protestations otherwise—are truthful and made based upon diligent investigation, were written in strict compliance with the Fed. R. Civ. P. 11 (b), and were verified by Plaintiffs and their Counsel under penalty of perjury.

*Defendants' Motion to Strike*

**2. Defendants' request to strike portions of Plaintiffs' Amended Complaint lacks legal justification as the pled facts are necessary to support the Plaintiffs' allegations that Defendants covered-up corruption and self-dealing by City officials sufficient to meet the 'shocks the conscience' standard.**

**2.1. Plaintiff claims require a showing of conscience-shocking behavior.** Substantive Due Process violations can be shown by governmental actions that are outrageous or "shock the conscience." Defendants—while correctly identifying this standard in their brief—attempt to argue that any allegations supporting this standard are improper, using a veritable cornocopia of synonyms. Def. Brf. at 1, 8–11, 14–15. The lack of these allegedly conscience-shocking facts was part of Defendants' original justification in their first Motion to Dismiss. Defendant's Original Brief (Doc. No. 8) at 14. Yet now, Defendants claim Plaintiffs are not permitted to plead these facts as they are somehow 'irrelevant' or 'scandalous'. However, Defendants were correct in their original brief: these facts are not improper, but are instead necessary to clearly demonstrate the motive behind the City's violation of Plaintiffs' due process rights.

2.2. **Allegations of conscience-shocking behavior such as covering-up corruption and self-dealing are naturally scandalous.** Defendants claim these facts are pled only by a "desire to embarrass, insult, and stain the reputation of the City Solicitor, his Office and other City officials." Def. Brf. at 8. While Defendants should be embarrassed by these facts, Plaintiffs have no illusions as to the shameless nature of Philadelphia politics; these facts are necessarily pled to provide this Court with the appropriate context to evaluate the City Solicitor's actions. They do not make allegations of the well-known general corruption within this City—though perhaps should have—but instead specific relationships backed by facts that provide motivation for improper acts constituting an abuse of power by City Officials to cover-up corruption and fraud that would shock the conscience of any reasonable person. Finally, it is unclear how any Plaintiff might meet that necessary standard if all allegations that are scandalous or insulting to a government official should be struck from a complaint, which seems to be the Defendants' default position.

2.3. **Allegations made 'upon information and belief' are appropriate means to plead information that is known to Plaintiffs but not within their personal knowledge.** As this information is properly pled and necessary for the Plaintiffs' claims, striking these pleadings would be improper. *See supra* discussion at # 1.1.

2.4. **Defendants' legal authority does not support their desire to strike Plaintiffs' necessary conscience-shocking allegations from their Complaint.** While Defendants spend several pages detailing why Plaintiffs' allegations are claimed to be factually incorrect, to support their Motion to Strike they rely on two quotations from cases—both offered without context. Defendant's Brief (Doc. No. 11) at 9. While the Defendants did correctly quote the language from *Gray* and *Collura*, neither case supports Defendants' proposition but instead would **hold the opposite**: a motion to strike **would be improper** under Fed. R. Civ. P. 12 (f) as "Motions to Strike are generally disfavored . . . as an attempt to summarily dismiss some question, of either law or fact, which the court ought

to hear and determine." *Corr. Med. Care, Inc. v. Gray*, 2008 WL 248977, 18 (E.D. Pa. Jan. 30, 2008) (quoting *Great West Life Assur. Co. v. Levithan*, 834 F.Supp. 858, 865 (E.D. Pa. 1993))(striking two paragraphs irrelevant to any claim). *See also Collura v. City of Phila.*, 2012 WL 6645532, 3 (E.D. Pa. Dec. 21, 2012) (striking "outrageous and wholly inappropriate" "abusive language" that the Court would have "*sua sponte* considered sanctionable" if not from a *pro se* litigant). While it is understandable that Defendants may wish to strike the entirety of Plaintiffs' most damaging allegations, their motion is without support.

*Due Process Claims*

3. **Plaintiffs, as *qui tam* relators, have a partial assignment of the government's damages claim, creating a property interest that both ensures the government aggressively pursues fraud and entitles them to certain procedural guarantees.**

Defendants' focus their argument on the speculative nature of the success of any lawsuit, and further on the City Solicitor's discretion to authorize the lawsuit, and claim that because the outcome of Plaintiffs' proposed complaint is uncertain, no property interest could attach. This focus and argument are inapt. While Plaintiffs are confident that their allegations of fraud will be vindicated and the City will be able to recover significant monies, they do not argue that their right exists as a share of the proceeds, instead that the property interest is **created by** it. The *qui tam* relationship creates the relator's rights/property interest, and the proceed-sharing by the City creates the *qui tam* relationship.

3.1. **The FCO uses nondiscretionary language "shall be entitled" which creates a partial assignment of the City's damage claim to the Relators.** FCO §19–3603 (8). The qui tam relationship between relator and government is created by this statutory language, which also manifests a partial assignment of the government's damages claim to the relator.[3] *See generally Vt. Agency of Natural Res. v. U.S. ex rel. Stevens*, 529 U.S. 765,

---

[3] While the *Stevens* analysis relys on interpretation of the FCA, not FCO, the latter is "based pretty much on the federal regulations" Transcript of 12/16/2009 Hearing for Cmte. on Law and Govt., Phila. City

772–774 (2000), abrogated on other grounds by *Cook County v. U.S. ex rel. Chandler*, 538 U.S. 765 (2000).  While the right to an actual share of proceeds (or said another way 'portion of the monetary judgment') does not materialize under the conclusion of the suit, the relator must have some interest in the claim: otherwise, a relator would never have Article III standing in federal courts.  *Stevens*, 529 U.S. at 771–772.  Justice Scalia thoughtfully considered this issue in *Stevens*, finding that "[t]he FCA can reasonably be regarded as effecting a partial assignment of the Government's damages claim" sufficient to provide standing for the relator.  *Id.* at 773.

The assignment of this damages claims is **entirely non-discretionary** under the FCO—being that the relator is "entitled" to a share of proceeds both through a civil action or an "alternative action"—the partial-assignment of the damages claim is "based upon the proposed complaint."  *See* FCO §19–3603 (8), (5).  Therefore, the submission of the complaint by a relator creates the property interest in the partial assignment of damages.[4] Further, the language of the FCO explicitly provides this partial assignment "[r]egardless of whether the City Solicitor has commenced a civil action or another party has been designated to do so" and the relator is "entitled to the same percentage share of any cash proceeds recovered by the City to which that person would have been entitled if the alternative action were a civil action."  *See* FCO §19–3603 (5).  While the recovery—if any—may be unknown, the same can be said of any possible cause of action.  However, that does not diminish the property interest of the partial assignment, and the relator and government are expected to work together *in good faith* to vindicate the government's right.

---

Council (Statement of Chairman William Greenlee, sponsor) at 3:9–11.

[4]Rather than a 'speculative' right, this property interest is well-grounded in the common law.  The Supreme Court has long-held that "cause of action is a species of property." *Logan v. Zimmerman Brush Company*, 455 U.S. 422, 429 (1982) (citing *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950)).

3.2.   **Plaintiffs' assignment in the government's claim as** *qui tam* **relators, entitles "certain procedural guarantees."** *See Stoner v. Santa Clara Cnty. Office of Educ.*, 502 F.3d 1116, 1126–1127 (9th Cir. 2007). Defendants claim that Plaintiffs can have no interest in the government's claim: "the underlying claim [under the FCA] always belongs to the government" *Id.* at 1126.[5] However, taken within context, *Stoner* holds the opposite: While the claim belongs to the government, the FCA motivates "a private individual[to] bring suit in federal court on behalf of the [government]" **by effecting a partial assignment of the government's damages claim to the relator.**" *Stoner*, 502 F.3d at 1127 (citing *Stevens*, 529 U.S. at 772)(emphasis added).[6] This partial assignment forms the basis for Plaintiffs' protected property interest: "The relator's interest in the lawsuit is limited to **certain procedural guarantees**, in addition to the 'bounty' the relator will receive for successfully assisting the government in vindicating the government's substantive rights." *Id.* at 1127 (emphasis added).

Historically, the *qui tam* relator—then termed an 'informer'—had the right to file suit on the government's behalf for a variety of frauds against the government, and did so without the involvement of the government. *See* 'Fundamental Right' discussion *infra* at # 4. However, this historical right has given way to the modern implementation, allowing a government to intervene, reducing the 'bounty' and increasing the government's percentage of recovery. However, this did not—and could not—eliminate the *qui tam* relator's property interest in the partial assignment. As a result, the Courts have found this interest entitles them to these 'procedural guarantees' so that their right is not wrongfully deprived by a lazy or corrupt government. The relator clearly has a "legitimate claim of entitlement" to

---

[5]Inexplicably, Defendants cite to *Mateski*, a *non-precedential* opinion, to quote language relating to the precedent set in *Stoner*. *U.S. ex rel. Mateski v. Mateski*, 634 F.Appx 192, 195 (9th Cir. 2015). *Mateski* is easily distinguishable from the instant case: The Realtor in *Mateski* failed to assert due process claims until on appeal at the 9th Circuit, and was provided exhaustive opportunity for due process at the district court, including the opportunity to oppose the government's Motion to Dismiss and additionally present a Motion for Reconsideration on the same issue. *Id.*

[6]The *Stoner* Court analyzed an attorney-relator's rights to proceed *pro se* under 28 U.S.C. §1654 to determine if the relator was a "party" entitled to self-representation, and found that because a relator represents the government in its claim, he must retain counsel or seek *pro hac vice* admission. *Stoner*, 502 F.3d 1116.

a his partial assignment of the government's damages claim, so there must be some process to protect them from an unfair or irrational deprivation of that property interest, which congruent their historical rights, are the procedural guarantees found by the *Stoner* court.

3.3.  **The relator is granted these procedural guarantees because the government may be unwilling to guard against or aggressively punish fraud.** The history of the False Claims Act demonstrates the governments inability or unwillingness "for whatever reason [to] guard against or aggressively punish fraud." 131 Cong. Rec. S10,853 (Aug. 1 1985)(Remarks by Mr. Grassley) *available at* `https://www.justice.gov/jmd/ls/legislative_histories/pl99-562/cr-s10853-54-1985.pdf`. However, whistleblowers—as *qui tam* relators—have proven much more successful at recovering money fraudulently withheld from the government. *See generally* U.S. Dep't of Justice, *Fraud Statistics Overview* (Dec. 21, 2018)(showing majority of government recovery due to whistleblowers), *available at* `http://www.justice.gov/civil/page/file/1080696/download`. This was explicitly recognized in the 1986 Amendments to the False Claims Act, as Congress balanced the needs to the government to protect its interests balanced against the government's need for a relator to "keep pressure on the Government to pursue the case in a diligent fashion." 131 Cong. Rec. H9388 (Oct. 7 1986)(Remarks by Mr. Berman introducing Legislative History) *available at* `https://www.justice.gov/jmd/ls/legislative_histories/pl99-562/cr-h9382-89-1986.pdf`. This has proven true.

Defendants claim that no meritorious lawsuit would be discretionarily declined by the City Solicitor, Def. Brf. at 13, yet the City's false claims ordinance has sat dormant for nearly a decade. Plaintiffs' Amended Complaint at 27. Defendants wish this Court to believe that, in the last nine years, in a city rife with corruption and fraud, **not a single meritorious claim** under the FCO has been presented to the City. This proposition strains belief. It is much more likely that numerous meritorious complaints have been presented to the City, but due to the City Solicitor's 'sole discretion'—without procedural rights for the relators—they have elected neither to guard against or aggressively punish fraud 'for

whatever reason', and done so in violation of all those relator's procedural rights.

4. **Plaintiffs as *qui tam* relators have a historical and fundamental right to directly access the Courts on behalf of the government, which is essential to the operation of the false claims mechanism.**

The recognition of a fundamental right requires "two primary features": (1) a right or liberty that is "objectively, deeply rooted in this Nation's history and tradition", and (2) "a careful description of the asserted fundamental liberty interest." *Washington v. Glucksberg*, 521 U.S. 702, 720–721 (1997).

4.1. ***Qui tam* relators are the essential foundation for the false claims mechanism to work, both historically and in modern times.** *Qui tam* relators, and their 'informer' forebear, have always been an important part of our government's strategy to enforce laws and protect against fraud against the government, since well before the founding of our nation. The government empowered individuals to vindicate the government's substantive rights without the intervention or interference of government officials, simply by taking their knowledge before the appropriate court. At the birth of our nation, this was not only a historic right (backed by centuries of English law) but also an essential one: Our government was simply incapable of pursuing all frauds against it. In our modern times, this has not changed. The primary changes to the *qui tam* mechanism are the increased size and capabilities of the government; the government had additional resources that allowed their fraud recoveries to be larger or more efficient, and a procedural mechanism was implemented in recognition of this change. Nonetheless, it was recognized that the government may not adequately do its duty 'for whatever reason' and that *qui tam* relators were an essential part of ensuring that the government pursues fraud aggressively.

**4.2.  Judicial review of *qui tam* claims was an established right recognized and continued through the founding of our nation.** The "long tradition of qui tam actions in England and the American Colonies" dates back to at least the 13th century, when suits were brought by individuals both on their own and the Crown's behalf. *Stevens*, 529 U.S. at 774. These lawsuits were "as prevelant in America as in England" both "immediately before and after the framing of the Constituion.'" *Id.* at 776. Common-law qui tam lawsuits were not permitted which were "dying out in England by that time[,]" but Colonies did pass "informer statutes expressly authorizing qui tam suits." *Id.* History is "conclusive [that] qui tam actions were 'cases and controverses of the sort traditionally amenable to, and resolved by, the judicial process." *Id.* at 777. While *Stevens* focuses on a *qui tam* relators's standing under Article III of the Constitution, the same historical analysis establishes judicial review as a historic and fundamental component of the *qui tam* mechanism.

Specifically, the Commonwealth (and Province) of Pennsylvania had many 'informer' statutes both during the Colonial and post-Revolutionary periods.[7] An informer would take his information before either a Justice of the Peace or Court of Common Pleas—depending on the value of the claim—and was entitled to a independent judicial hearing on the issue—which would result in the ultimate 'bounty'. These informer statutes were indistinguishable from a *qui tam* suit.[8] However, in these early informer proceedings, as in early FCA laws, no consideration was given for the government to intervene.

The early American "Lincoln Law" of the Civil War was a mere update of the early American 'informer' rights, and carried with them the same right to bring the governments claims before an appropriate court, brought as a relator in the name of the United States. *See* Whistleblowers International, *Whistleblowing History Overview* (last visited Apr 24,

---

[7]As early as 1683, informers were provided shares of everything from unpaid customs duties, adulterated liquors to a bounty for "swine [found] running at large." *See generally* Pennsylvania Legislative Reference Bureau, Statutes at Large Vol. 1, (Index) p. 618 (2001) *available at* `http://www.palrb.us/stlarge/index.php`, direct download *available at* `http://www.palrb.us/statutesatlarge/16001699/16821700/0/index/actindex.pdf`).

[8]The term *qui tam* had a specific meaning at that time, being short for: *qui tam pro domino rege quam pro se ipso in hac parte sequitur*, or '[he] who sues in this matter for the king as well as for himself'.

2019) *available at* `https://www.whistleblowersinternational.com/what-is-whistleblowing/history/`
Only during World War II—after the government eliminated the 'bounty'—did *qui tam* law-suits fall off. *Id.* However, Congress, recognizing massive fraud against the United States, enacted the modern version of the False Claims Act, focusing on the need for *qui tam* relators and the rights they should have. *Id.*

The history of *qui tam* suits demonstrates relators have **always** been entitled to the judicial process for their claims, save for two recent municipal implementations: New York City (2005), and Philadelphia (2010). New York City provides for submission to the City, which must either adopt the complaint or designate the relator unless specific criteria are met.[9] However, New York City's implementation is redundant to New York State's False Claims Act, which does permit a relator to file a case directly on behalf of the State or *local municipality*, preserving the relator's right to access the Courts.[10] *See* N.Y.S. State Fin. Art. 13, §190 (2) (a). As a result, Philadelphia alone stands as the **only** jurisdiction in the country where a *qui tam* relator is denied access to the Courts for their claim, despite this being a long-recognized and historical right within the Pennsylvania, and a fundamental right existing since before the birth of our nation.

4.3. **The fundamental right is 'The *qui tam* relator's right to directly access the Courts on behalf of the government.'** This right would necessarily encapsulate the right to file their *qui tam* complaint with the appropriate Courts, and for the Court to judicially review their complaint/claims prior to any dismissal—including dismissal by the government. This is essential as the government may not 'for whatever reason' adequately protect the relator's property interest (partial assignment of the damages claim) and the historical recognition that the government agents/officials may not be able or willing to

---

[9]These criteria for rejection do include "failure to state a claim." N.Y.C. Admin. Code §7–804 (b) (3).

[10]While New York City's implementation does unduly burden a relator's fundamental right to judicial access and is unconstitutional, a relator retains his rights through an alternate and essentially equivalent implementation, and thus can avoid the ridiculous necessity of filing a due process claim in Federal Court. This is unlike Philadelphia, where Pennsylvania offers no state law alternative that Plaintiffs might pursue these claims—else you can be assured they would have.

pursue all fraud—despite their fiduciary duty to do so—and the relator is a necessary means to 'keep pressure' on the government.  This access for *qui tam* relators was not seen just as a historical right but an established right essential to the effective operation of the false claims mechanism, as it was recognized that the government may not always adequately work as it should, vindicating its rights on behalf of the people.

The Supreme Court teaches in *Washington* that courts should be "reluctant to expand the concept of substantive due process [as] "extending constitutional protection to an asserted right or liberty interest, [the Court] place[s] the matter outside the arena of public debate and legislative action," so that due process liberty is not "subtly transformed into the policy preferences of the members of [the Supreme] Court." *Washington*, 521 U.S. at 720 (rejecting a right to assist suicide).  However, there is no danger of 'subtle transformation' here: this carefully described and narrowly tailored right is already universal in every jurisdiction allowing *qui tam* lawsuits—except Philadelphia.[11]  Neither does recognition of this right chill any debate or legislative action, as other jurisdictions already inherently recognize this right.

5.  **Defendants failed to provide even the basic necessary procedural protections for Plaintiffs' rights, as shown by their continually moving goalposts and final rejection based upon an obviously incorrect interpretation of the law.**

To succeed in a procedural due process claim, a plaintiff must demonstrate that "(1) he was deprived of an individual interest that is encompassed within the Fourteenth Amendment's protection of 'life, liberty or property,' and (2) the procedures available to him did not provide 'due process of law'." *Hill v. Borough of Kutztown*, 455 F.3d 225, 233–234 (3rd Cir. 2006).

---

[11]Plaintiffs' Counsel searched extensively for any and all state or municipal implementations of a false claims-style mechanism.  Thirty-six states permit *qui tam* suits, either for general fraud or limited to Medicaid fraud.  Not a single state denies a relator the right to file their action in Court.  A similar review of municipal implementations—while in no way comprehensive—found only New York City and Philadelphia denying the relator's right to file.  However, Pittsburgh does have a false claims ordinance permits *qui tam* relators to file in court consistent with the federal FCA.  *See* Allegheny County Code §485-2 *et seq.*

5.1. **Plaintiffs have shown their protected property interest in their partial assign-ment of damages and fundamental right to judicial review as *qui tam* relators.** *See Stevens*, 529 U.S. at 771–778, *See also supra* discussion at # 3, 4.

5.2. **Even if informal proceedings were sufficient to to protect Plaintiffs' rights, De-fendants failed to provide even the basic necessary protections.** Defendants argue that they offered "informal procedures" which resulted in a "fully informed" and "careful and deliberate" decision. Def. Brf. at 18. Plaintiffs pleadings clearly show the opposite: The City Solicitor immediately denied Plaintiffs' claims as a knee-jerk reaction in a six-minute telephone call without explanation, and have continually moved the goalposts each time Plaintiffs explained the errors in each of Defendants' rationales. Am. Cmplt. at ¶45, *passim*. However even assuming, *arguendo*, that Defendants' suggestion that 'informal pro-cedures' are sufficient here to protect the relator's fundamental and historic rights, they fail to directly address even the most basic principles of due process: notice and a hearing. *See Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985) ("the root requirement" of Due Process). In fact, the pleadings show that the Plaintiffs were never fairly heard, but instead that the City Solicitor made their decision early on in the process and—as their rationales were successively disproven—simply continued to seek a new pretext to support their original decision.

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

5.3. **Defendants failed to 'fully informed' Plaintiffs as demonstrated by their con-tinually moving goalposts.** Notice must be "calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections" *Mullane*, 339 U.S. at 314. Defendants claim that Plaintiffs were

"fully informed" Def. Brf. at 18.  Plaintiffs assume that Defendants meant to argue that Plaintiffs had were 'fully informed' and thus had adequate notice.[12]

Defendant cite to *Horowitz* which—in contrast to their argument—teaches that Plaintiffs were required to be "fully informed" **prior to** the City Solicitor's decision-making as a function of the notice requirement.  *Bd. of Curators of the Univ. of Mo. v. Horowitz*, 435 U.S. 78, 85, 80–82 (1978).[13]  However, Plaintiffs were **misinformed** prior to the meeting, as the *issue of damages had never been raised*.  In fact, Plaintiffs had carefully and specifically identified the two issues with Defendants: writing them down, reading them back, accepting corrections, and then emailing to memorialize those issues.  Neither issue was damages.  At the start of the meeting, Defendants again rejected the claim, for reasons that were not based on damages.  Damages became an issue when Defendants finally realized they had no remaining reason to deny Plaintiffs' claims.  Then—suddenly—damages became an issue, moving the goalposts again to find a new pretext for denial.  These 'moving goalposts' show that at no point were Plaintiffs 'fully informed' as Defendants suggest, but rather that Plaintiffs were never given the adequate notice required by due process.

**5.4.**   **Defendants final denial is neither factually supported nor based upon a clearly erroneous interpretation of law, therefore could not be 'careful and deliberate'.**
Plaintiffs further rely on *Horowitz* in claiming that Defendants' final rejection letter, Am. Cmplt. at Ex B, was a "detailed, well-reasoned letter that shows the careful and deliberative fashion in which the City Solicitor considered and declined" Plaintiffs' claims.  Def. Brf. at 8.  Notably, Defendants do not anywhere in their seven-plus page recital of the

---

[12]This assumption is made graciously, as Defense Counsel's actual—and erroneous—argument is that Plaintiffs merely need to be fully informed 'of the basis of [City Solicitor's] decision' on a *post hoc* basis.

[13]In *Horowitz*, a first-year medical student failed to meet the minimum standards for her university, having difficulty academically, clinically, and in other areas.  The University allowed her to advanced into her second-year "on a probation basis."  When the student's performance failed to improve, she was notified that she would not graduate with her class and "absent radical improvement" she would be dismissed from school.  The student was then offered the opportunity to be *independently* evaluated by *seven* physicians, then required to repeat the her final year before her ultimately dismissal from the program—after two years of *consistent* feedback and warnings.  *Horowitz*, 435 U.S. at 80–82.

"background" suggest that the Defendants' conclusion was correct. Nor could they, as their rejection is inopposite both any legal standard and the facts provided. Not only are damages **not** a required element of the False Claims Ordinance, but the City of Philadelphia was *fraudulently deprived of at least $9 million dollars.* Am. Cmplt. at ¶¶103–113.

5.5. **Local Agency Law may destroy Plaintiffs Procedural Due Process claim,** *if* **the City Solicitor is a local agency subject to judicial review** *de novo.* Plaintiffs pled—in the alternative—for local agency review under Pennsylvania Local Agency Law. Assuming that the City Solicitor is a local agency under and Plaintiffs have a right to judicial review *de novo* under then Plaintiffs concede that they have not yet exhausted their procedural rights.[14] 2 Pa. C.S. §101, §752.

6. **Defendants have failed to identify any compelling government interest necessary to burden Plaintiffs' historic and fundamental rights as** *qui tam* **relators.**

When burdening a fundamental right rooted in history and tradition, the government must show the proposed ordinance is constitutional under heightened scrutiny. *See Lutz v. City of York, Pa.*, 899 F.2d 255, 268–70 (3rd Cir., 1990).

6.1. **Plaintiffs have shown their historical and fundamental right as relators to a judicial review of their** *qui tam* **claim.** *See Stevens*, 529 U.S. at 771–778, *See also supra* discussion at # 4.

6.2. **Defendants fail to identify any compelling or important government interest to prohibit Plaintiffs from exercising their right to judicial access as** *qui tam* **relators.** Plaintiffs acknowledge that this was an error in pleading; as Plaintiffs do argue in their pleadings that there is no 'rational basis' for the FCO's 'Do Nothing' provision under

---

[14]Plaintiffs note that Defendants have neatly side-stepped any discussion if the City Solicitor is a local agency and if an appeal is possible, but instead oppose judicial review *de novo* on procedural grounds.

FCO §19-3603 (2) (b) (.2).[15]  However, Plaintiffs do not (and likely cannot) provide any 'compelling' or 'important' government interest that the 'Do Nothing' provision serves.

**6.3.** **Without any compelling/important government interest, Defendants have failed to affirmatively demonstrate that the 'Do Nothing' provision is constitutional.** Under either heightened scrutiny, the government has identified no compelling or important interest that would allow the FCO's 'Do Nothing' provision of the FCO to survive.  As the burden rests on the Defendants to prove constitutionality under heightened pleading, Defendants have shown no reason to dismiss Plaintiffs' claim. *See Lutz*, 899 F.2d at 268–70

**7.** **Defendants' abuse of official power to protect powerful politically connected individuals from liability under the FCO is conscience-shocking behavior.**

While Defendants (over)zealously contest Plaintiffs' allegations of corrupt behavior on the part of City officials, Defendants focus their arguments primarily on the propriety of Plaintiffs' allegations.  *See* 'Information and Belief' discussion at # 1.1 *supra*.  Other than several formulaic recitations that Plaintiffs have failed to "allege any outrageous or conscience-shocking conduct," Defendants do not deny that the conduct as alleged would qualify, and instead want to wish away these allegations through a motion to strike. Def. Brf. at 14, 8–11. However, Plaintiffs have shown behavior that is "arbitrary, irrational, tainted by improper motive or so egregious that it shocks the conscience." *Nicholas v. Penn. State Univ.*, 227 F.3d 133, 139–140 (3rd Cir. 2000).

---

[15]Defendants have identified the financial burdens that *may* consume resources as a basis for the ordinance. However, while this may provide a legitimate reason under rational basis, the mere consumption of a limited amount of resources is neither a compelling nor important government interest.

7.1.   **Plaintiffs have shown their protected property interest in their partial assign-
ment of damages and fundamental right to judicial review as *qui tam* relators.**
*See Stevens*, 529 U.S. at 771–778, *See also supra* discussion at # 3, 4.

7.2.   **Plaintiffs have adequately pled facts showing an abuse of official power to cov-
er-up corruption and fraud that implicates politically important individuals.**
These pleadings allege a *quid pro quo* relationship between Mayor James Kenney[16] and
Vincent Fenerty, a major political player in Philadelphia, who also happens to be a primary
target of Plaintiffs' false claims complaint. It also details relationships between the Mayor
of Philadelphia and numerous politically-connected individuals in his retinue that either
participated in or benefited from Conduent and the Parking Authority's fraud, as well as
provides a glimpse of the intricate interplay of relationships that exist in Philadelphia poli-
tics that result in corruption, fraud, and self-dealing routinely being ignored or covered-up.
Am. Cmplt. at 114–134.

Plaintiffs further alleged abuses of official power by the City Solicitor by assigning a
senior appointee within the office to handle the Plaintiffs' complaint, with the expectation
that it would be 'killed' so as to protect those powerful and politically important individuals
who might be implicated or otherwise caught up in the fraud. This abuse of power is detailed
thoroughly and chronologically showing how Plaintiffs were stonewalled and the goalposts
were continually moved to ensure that Plaintiffs complaint would not be appropriately
prosecuted, and those senior members of our city's political royalty would be protected.

7.3.   **Abuse of official power to cover-up the corruption and fraud of senior mem-
bers of government necessarily 'shocks the conscience.'** While what may 'shock the
conscience' is an evolving area of the law, actions such as "corruption, self-dealing or bias
against an ethnic group" would be included. *Chainey v. Street*, 523 F.3d 200, 220 (3rd Cir.
2000). Similarly, as "the cover-up is worse than the crime", it must also shock the con-

---

[16]Defendants try to frame Mayor Kenney as a 'non-party' to the lawsuit despite his position as chief executive.

science if an official takes action to protect individuals participating in corruption, fraud, or self-dealing, since they are tacitly approving-of and participating-in the same.

*First Amendment Claim*

**8.** **Defendants fail to provide any basis for dismissal of Plaintiffs' First Amendment challenge to the FCO's confidentiality provision.**

Defendants have offered little to support their request for dismissal of Plaintiffs' First Amendment claims. Instead, Defendants' motion suggests that Plaintiffs' are claiming the FCO's 'seal' provision under FCO §§19-3603 (6) (a)–(b) is unconstitutional; however this contention is unsupported by Plaintiffs' pleadings.[17]  Instead, Plaintiffs plead that, under FCO §19-3603 (2) (c)(requiring confidentiality), Defendants are trying to unconstitutionally restrict the speech of Plaintiffs (and the public). Am. Cmplt. at 135-138, 189-201.

**8.1.** **Defendants conflate *their right* to file *their claim* under seal with a general right to restrict the speech of the public.**  Defendants suggest that the FCO confidentiality provision is somehow analogous to a short-term seal for investigatory purposes by the government under *ACLU v. Holder*, 673 F.3d 245 (4th Cir. 2011). It is not: The government's right to seal a claim exists only for *their claim*, and does not apply to some other cause of action (such as when they are a Defendant) that they assert is related.  Further, any other justifications under under *ACLU v. Holder* (*e.g.* investigation, evaluation) also fails: Defendants have already rejected Plaintiffs' claims, and therefore require no further secrecy.

**8.2.** **Defendants offer no relevant legal authority in support of their request for dismissal of Plaintiffs' facial challenge.**  Perhaps due to Defendants' confusion over the difference between 'seal' and 'confidentiality', they offer no relevant legal authority to support dismissal of their claims.  However, this is a question of largely-settled law.  A

---

[17]Frankly, this contention by Defendants makes the entire section on this issue very difficult to understand, as it is necessary to try to separate Defendants' arguments that they are permitted to file under seal—which is not in dispute—with their right to bind the public to confidentiality and thus restrict speech.

law imposing confidentiality on the public for based upon their submitted complaints is impermissible, as the state must show a compelling interest that a narrowly-tailord speech restriction addresses. *See Stilp v. Contino*, 613 F.3d 405 (3rd Cir., 2010) (rejecting restraint on speech based on need for confidentiality of state ethics proceedings). Defendants have failed to show any government interest, much less a compelling one, that would satisfy their motion to dismiss.

8.3. **Plaintiffs similarly fail to provide authority to support dismissal of Plaintiffs' 'as applied' challenge.** Defendants suffer from the same lack of legal authority necessary to dismiss Plaintiffs' facial challenge to the FCO confidentiality provision, and Plaintiffs will not repeat those arguments here. However, Defendants try to make three arguments related to Plaintiffs' as-applied challenge, though none can salvage Defendants' flawed motion.

First, Defendants claim their email constituted merely a "legal position" under *Teesdale v. City of Chicago*, 690 F.3d 829, 832-833 (7th Cir. 2012). Def. Brf. at 20. This is fundamentally incorrect. In *Teesdale*, the 'legal position' was from a brief to the Court, and contained the attorney's legal argument supporting their position. *See Teesdale*, 690 F.3d at 832-833. Here, the attorney was making speech-restricting demands of opposing counsel upon authority of his clients. Am. Cmplt. at ¶¶135–136, Def. Brf. at 20–21.

Second, the email was "limited on its face." Def. Brf. at 20. However, this is quickly disproven by the pleadings, as the quoted email offers no such limitation: "That would obviously include the discussions you had with the City Solicitor's office that you purport to quote in your complaint." Am. Cmplt. at ¶135. Clearly, Defense Counsel intended to confidentially bind "all information" and is now merely trying to revise his mistake.

Third, and unclearly, Defense Counsel is either arguing that by submitting a FCO complaint, Plaintiffs were somehow agreeing to the Defendants' restriction of their speech forever due to their submission of a complaint under the FCO,[18] or perhaps that the Defendant's

---

[18]Defendants cite to cases requiring compliance with the false claims statutory provisions. Def. Brf. at 20. *See, e.g., U.S. ex rel. Surdovel v. Digirad Imaging Solutions*, 2013 WL 6178987 (E.D. Pa. Nov. 25, 2013)

restriction of their speech was somehow too short of time ("less than three weeks") to be an infringement. Def. Brf. at 20–21. However, neither contention is constitutionally sufficient to burden Plaintiffs' right to free speech.

**8.4.   Defendants are well aware that Plaintiffs did not voluntarily choose to restrict their own speech, but only did so under risk of penalty.** Defendants suggest that Plaintiffs "entirely voluntarily" chose to restrict their own speech despite the Defendants coercive threat of penalty—due to the use of the word "elected." *Id* at 21.[19] This is fallacious.

*State Law Claims*

**9.   Plaintiffs' amended claims for Judicial Review *De Novo* were timely-filed and this Court may and should exercise supplemental jurisdiction.**

**9.1.   Defendants' claim that this Court is jurisdictionally prohibited from hearing Local Agency Review is not based in law.** While Defendants' make a spurious argument that Pennsylvania may somehow exclude federal courts from hearing cases by declaring a state court's "exclusive" jurisdiction, this supposition does not comport with the operation of federal courts, nor any jurisprudence going back at least as far as 1871.[20] In fact, the Supreme Court has specifically held that federal courts were permitted to exercise supplemental jurisdiction over local agency review where the Court's original jurisidiction is based in a federal question. *See City of Chicago v. Int'l Coll. of Surgeons*, 522 U.S. 156 (1997). Defendants contention that this Court lacks jurisdiction is simply wrong.

---

(dismissing a relator's suit for failing to serve a complaint on the government), *U.S. ex rel. Tex. Portland Cement Co. v. McCord*, 233 U.S. 157 (1913) (prematurely filing suit before permitted then failing to timely file suit within six month deadline and seeking to relate second suit to first).  Defendants again conflate their rights to seal under the FCO with their rights to restrict public speech.

[19] Defendants' quote from *R.C. Maxwell* is inapt. While the tenant claimed coercion, the landlord denied state-coercive action but "entirely voluntarily" removed billboards from their property to maintain good relations with the borough. *R.C. Maxwell Co. v. Borough of New Hope*, 735 F.2d 85, 89 (3rd Cir. 1984).

[20] "The judicial power of the United States extends by the Constitution to controversies . . . arising under the Constitution, treaties, and laws of the United States, and the manner and conditions upon which that power shall be exercised . . . are mere matters of legislative discretion." *Railway Co. v. Whitton Adm'r*, 80 U.S. 270, 288–289 (1871).

**9.2.** **Plaintiffs' timely filed this action prior to the expiration of their right of appeal, and their amended pleading relates back to the original filing.** This suit was initiated on February 21st, 2019, and Defendants admit that Plaintiffs had until at least March 11th, 2019 to timely file their appeal. Def. Brf. at 22. Under the Fed. R. Civ. P. 15 (c) (1) (B), "An amendment to a pleading relates back to the date of the original pleading when . . . the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out—or attempted to be set out—in the original pleading[.]" Here, the Plaintiffs have clearly shown the conduct that their claims arose from, all of which exhibit the same essential nucleus of the Plaintiffs' proposed Complaint and the Defendants conduct in rejecting it, therefore their claims properly relate back to the original filing date.

**9.3.** **In the alternative, Defendants still have not properly noticed Plaintiffs of their adjudication.** Defendants are required to serve their adjudication through "personal service" or "by mail." 2 Pa. C.S. §555. Plaintiffs' Counsel was emailed on February 8th by Diana Cortes, however neither Plaintiffs nor their Counsel was ever served with this letter either personally or by mail. Email is not an enumerated method of service, nor is it an accepted form of 'personal service' within the state. Therefore, Plaintiffs are not 'out of time,' as the Defense suggests, but rather the clock has not yet started.[21]

**9.4.** **The exercise of supplemental jurisdiction is appropriate for Plaintiffs' pendant claim for Local Agency Review.** Supplemental jurisdiction is appropriate for claims "that are so related . . . that they form part of the same case or controversy" and where the exercise of that jurisdiction "best serves the principles of economy, convenience, fairness, and comity which underlie the pendent jurisdiction doctrine." 28 U.S.C. §1367, *See generally City of Chicago*, 522 U.S. 156. As the subject matter of this suit contains the adjudication

---

[21]Defendants' authority supports this contention. That court held that the date of service starts the clock under 42 Pa. C.S. §5571 (b) and "[i]n accordance with 42 Pa. C.S. §5572, the date of entry of the decision is 'the date of service of a government unit which shall be the date of mailing if service is by mail.'" *Berger & Montague v. Phila. Historical Comm'n*, 898 A.2d 1, 4 (Pa. Commw. Ct. 2006).

Plaintiffs seek to review, it would be appropriate for this Court to exercise supplemental jurisdiction and offer the necessary judicial review, so that Plaintiffs are not required to initiate a concurrent matter in State Court.

*City Solicitor as Defendant*

10. **The City Solicitor is an essential Defendant as the designated FCO authority and can not be dismissed from this suit for injunctive and declaratory relief.**

Plaintiffs are seeking to declaratory and injunctive relief specifically against the Marcel Pratt in his official capacity. Any injunction issued in this matter will be against the City Solicitor and require specific performance on his part, as the designated FCO authority.[22] *See* FCO §19–3603 (2)

*Concessions*

11. **Plaintiffs concede Counts # 6–7 for Breach of Contract and Unjust Enrichment.**

While Plaintiffs believe they have a good faith argument on both claims, despite the weight of authority, several factors weigh against their continued prosecution, including and primarily the recognition that both claims tend to result in monetary damages, which Plaintiffs are not seeking in this case. As a result, Plaintiffs consent to dismissal with prejudice, so that this Court can concentrate focus on the constitutional issues raised.

---

[22]Defendants search for any authority to remove Mr. Pratt from the suit, finding *Burton v. City of Phila.*, 121 F.Supp.2d 810 (E.D. Pa. 2000). However, unlike here, *Burton* was a suit for monetary damages to paid from City coffers and did not seek equitable relief, which is the reason an official capacity lawsuit was "redundant." *See id*, *See also Kentucky v. Graham*, 473 U.S. 159, 169 fn. 14 (1985) ("There is no longer a need to bring official-capacity actions against local government officials, for under Monell, local government units can be sued directly for damages").

## CONCLUSION

Plaintiffs respectfully request that this Court deny Defendants' Motion to Dismiss and to Strike in all regards except to dismiss Counts #6–7. Plaintiffs further ask leave to amend if this Court determines their pleadings are otherwise deficient.

Respectfully Submitted,

**Andrew B. Austin, Esq.**
Pennsylvania Bar # 323768
*Attorney for Plaintiffs*

STACKHOUSE GROUP
P.O. Box # 54628
Philadelphia, Pennsylvania, 19145
+1 (610) 656-1956
austin@stackhousegroup.com

27

## CERTIFICATE OF SERVICE

I hereby certify that I have served a copy of this **Plaintiffs' Opposition to Defendants' Renewed Motion to Dismiss and Motion to Strike** and any accompanying memorandum or other documents upon the Defendants or their Attorneys of Record via electronic case filing on **April 24, 2019**.

Respectfully Submitted,

**Andrew B. Austin, Esq.**
Pennsylvania Bar # 323768
*Attorney for Plaintiffs*

STACKHOUSE GROUP
P.O. Box # 54628
Philadelphia, Pennsylvania, 19145
+1 (610) 656-1956
austin@stackhousegroup.com